No. 46,798

LILLIAN M. FUNKE, *Appellant*, v. E. JAY FIELDMAN, *Appellee*.

(512 P. 2d 539)

Opinion filed July 14, 1973. 

*Gerald L. Michaud,* of Michaud, Cranmer, Syrios and Post, of Wichita, argued the cause, and *Ronald D. Heck,* of the same firm, was with him on the brief for the appellant.

*William Tinker,* of McDonald, Tinker, Skaer, Quinn & Herrington, of Wichita, argued the cause, and *Norman I. Cooley,* of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action for malpractice against a physician anesthesiologist to recover for injuries sustained as the result of the administration of a spinal anesthetic alleged to have been negligently performed.

The plaintiff (appellant), Lillian M. Funke, had experienced a

dull ache in her side for several years prior to 1967. The ache got much worse prior to her menstrual periods. Because of the ache the appellant consulted Dr. Gordon T. Cowles and was placed on birth control pills as a result of the consultation. However, Mrs. Funke subsequently became pregnant and gave birth to her sixth child in August, 1967.

Unforeseen complications prior to the birth of the child resulted in Dr. Cowles' recommending and subsequently administering a caudal anesthesia to Mrs. Funke for the birth. Mrs. Funke had no reaction to the caudal anesthesia and thought it was "marvelous". She continued treatment with Dr. Cowles and eventually was advised to have a hysterectomy. Arrangements were made, and Mrs. Funke entered Wesley Medical Center in Wichita, Kansas, on November 12, 1967, for the scheduled hysterectomy on November 13.

On the evening of November 12, 1967, Dr. Cowles visited Mrs. Funke in her room and advised her that Dr. E. Jay Fieldman (defendant-appellee) was her anesthesiologist and would be in to see her.

Dr. Fieldman visited the plaintiff that same evening. The plaintiff testified that he walked into her room and introduced himself, but only stayed approximately three to four minutes. Dr. Fieldman gave the plaintiff no physical examination but did ask her what kind of anesthetic she wanted. She replied that Dr. Cowles had recommended a spinal to which Dr. Fieldman replied "well, those are the best".

Dr. Fieldman went on to state that he liked to give those and that the most you could get from them is a headache and that "we have medicine for that now".

Before continuing with the facts, a brief discussion of the anatomy and the details of the procedure involved is in order.

The spinal cord runs the length of the back from the brain to approximately the first lumbar vertebra. Below that area the nerves flare out into what is termed the cauda equina (horse's tail). In a caudal anesthetic the anesthetic solution is not placed within the spinal column or subarachnoid space, while in a spinal anesthetic the solution is placed within the subarachnoid space. There is a lateral approach or method of giving a spinal anesthetic which consists of the insertion of the needle through the skin lateral to the midline of the patient's back. The aim in the performance of the spinal anesthetic using the lateral approach is to place the

needle within the midline or the center of the intervertebral canal.

The cauda equina nerves are hanging free and are bathed in spinal fluids. The spinal cord which ends in a bulbous mass (conus medullaris) normally ends opposite the first lumbar vertebra.

The Anatomical Record, volume 88, published April, 1944, (defendant's exhibit No. 6.), states that termination of the spinal cord ranges from the level of the lower third of the twelfth thoracic vertebra to that of the middle third of the third lumbar vertebra.

Dr. William H. L. Dornette, called as a witness upon behalf of the defendant, testified the purpose of spinal anesthesia is to produce a block of the spinal nerves which will relieve pain and will produce muscular relaxation. Dr. Dornette explained the subarachnoid space is occupied by the spinal cord and other nerves and is filled with spinal fluid which is watery like substance. The nerves leave the spinal cord and transverse varying lengths of the subarachnoid space. Dr. Dornette continued to testify in detail about this part of the anatomy, stating in part that,

". . . The spinal cord ends at the upper part of the small of our back, normally you would not expect it to end lower than the body of the second lumbar vertebra. The cord tapers down gradually and at the very bottom there is a slight enlargement which is called the conus medullaris and the cauda equina extends from the conus medullaris and exits through the lower lumbosacral coccygeal foramen.

"The fetus has a spinal cord which extends the entire length of the spinal column. At birth the body is starting to grow much faster than the spinal cord so that the tip of the spinal cord rises within the spinal column until finally in the adult, it is located somewhere in the region of the body of the second lumbar vertebra.

"The nerves that form the cauda equina are approximately one to two millimeters in diameter, which is approximately the diameter of the lead in an old fashioned lead pencil. The nerves that formulate the cauda equina are within the subarachnoid space and are surrounded by and float within the spinal fluid.

"To advance or put the needle through an individual's back into the subarachnoid space in the spinal anesthetic procedure, it would be necessary for the needle to pass through the subcutaneous tissue, supraspinous ligament between the spinous processes, through the interspinous ligament and through the epidural space, the dura and into the arachnoid membrane which fuses together and forms the subarachnoid space."

As for the actual procedure involved, Dr. E. Jay Fieldman was called as a witness on behalf of the plaintiff and on direct examination he testified to the following:

"I made the initial spinal tap at the L2-3 interspace. [This is the interspace between the second lumbar vertebra and the third lumbar vertebra.] This

is the highest possible interspace at which the procedure can be safely done because in the average person, the spinal cord comes down to the L1-2 interspace. If the initial tap is done higher than the L2-3 interspace there is a danger of traumatizing the spinal cord which would cause nerve or spinal cord damage that would result in weakness in one of the legs.

. . . . . . . . . .

"I usually aspirate when I attach the syringe, but I cannot recall whether I did in Mrs. Funke's particular case. . . ."

Dr. Fieldman went on to state that while he was not taught at the Mayo Clinic to aspirate, in many instances it is important to aspirate before starting an injection and in some instances it is dangerous. Dr. Fieldman agreed that if the plunger rotates freely but spinal fluid cannot be aspirated freely, the needle is not in the right place. The purpose of aspiration is to ascertain if you are getting a free flow of spinal fluid which indicates the needle is in the subarachnoid space rather than up against or inside a nerve, in which case a free flow of spinal fluid would not be present.

Mrs. Funke testified she was sleepy and drowsy from the pre-operative medication when she arrived at the operating room and was placed on the operating table. She was awake when she was set up but did not see Dr. Fieldman. She does remember hearing his voice when he gave instruction on the anesthetic.

The plaintiff was in a sitting position with her legs straight out and held in a position which caused her to lean over with her head very low.

The plaintiff testified when the needle was first inserted she felt a terrible pain down her leg; that her leg jerked; and she said "Oh". The plaintiff testified that Dr. Fieldman then said "Sit still" and soon thereafter the plaintiff felt another pain and remarked to Dr. Fieldman that, "Something's wrong, my legs aren't going to sleep". Dr. Fieldman then said, "Well, maybe we had better remove the needle". He then reinserted the needle at the L3-4 interspace. Plaintiff then remembers nothing after her legs went to sleep.

Evidence disclosed that about two tenths of a cubic centimeter of anesthetic solution was injected through the needle at the place of its initial insertion before the needle was reinserted at the lower interspace.

Testimony disclosed that when the anesthesia disappeared, paralysis remained on the left side with total anesthesia to pain as well as temperature with reduced sensitivity to touch. Testimony

also showed that the plaintiff's left leg was so sensitive that doctors could hardly examine it and that a problem with control of bladder and bowels existed.

The plaintiff contends the trial court erred (1) in finding that the defendant was not negligent and in finding generally for the defendant when the evidence was not sufficient to support said findings; (2) in finding plaintiff gave an informed consent to the spinal anesthesia prior to its administration; and (3) in' finding that the doctrine of *res ipsa loquitur* was not applicable to this case.

Under K. S. A. 60-252 (*a*) where trial is to the court, as here, the trial judge shall find the controlling facts, and on appellate review the findings of fact made by the trial judge shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. (*Short v. Sunflower Plastic Pipe, Inc.,* 210 Kan. 68, 500 P. 2d 39.)

The appellant first contends the appellee was negligent in proceeding to start the injection of the solution after she experienced the sudden severe pain down her leg, rather than removing the needle and repositioning it before injection of the solution; and that the appellee was negligent in not heeding the warning of the first pain, and in waiting until she cried out a second time before removing the needle and repositioning it in the next lower interspace.

The appellant's nerves which were adversely affected are described as L-5, L-4, S-1 and S-2. Dr. Dornette, during his direct examination on behalf of the defendant, stated that in his opinion, "There's just no possible way that you can injure four nerves on one side without an injection into the substance of the conus." Dr. Dornette was cross-examined with the assistance of a work called *Neurological Complications after Spinal Anesthesia and Results from Two Thousand Four Hundred Ninety Three Follow Up Cases,* by Gunnar Thorsen, Stockholm, 1947. The cross-examination began with a paragraph entitled "Injuries via an Assumed Endroneural Injection". An endroneural injection is an injection into a nerve root or into a nerve. When counsel for the appellant began comparison between the plaintiff's case and the case reported by Thorsen, the defendant objected and the court ruled that the plaintiff could finish her cross-examination relative to the reported case but would not be allowed to cross examine Dr. Dornette on any other cases reported in Thorsen's work. Plaintiff

sought to proffer other similar cases to compare the complaints and residuals of the plaintiff but was not allowed to proffer the information by the court. There was also evidence introduced that 1.8 percent of the population, or one in every fifty-five persons, has a low lying conus medullaris which extends down to the L2-3 interspace.

Suffice it to say evidence in the record establishes there is a possibility of nerve damage from a spinal injection, such as the appellant sustained in the instant case.

The appellant argues that even if her conus medullaris actually does extend down to the L2-3 interspace, if she had a complaint of pain when the defendant put the needle in followed by an injection without repositioning the needle, he departed from standard approved medical practice, which departure caused her injury.

The long standing general rule, consistently adhered to by this court in malpractice cases of this character, is that expert medical testimony is ordinarily required to establish negligence or lack of skill on the part of a physician or surgeon in his medical diagnosis, his performance of surgical procedures and his care and treatment of the patients. (*Collins v. Meeker*, 198 Kan. 390, 394, 424 P. 2d 488 and cases cited therein.) An exception to the general rule exists where the results of medical treatment are so patently bad as to be manifest to lay persons or as to come within the common knowledge and experience of mankind generally. (*Collins v. Meeker*, supra, and cases cited there.)

Without belaboring the point further we hold the record does contain substantial competent evidence in the form of expert medical testimony to support the trial court's finding that the appellee was not negligent in the performance of the spinal anesthetic injection.

We now turn to the appellant's second point—that the trial court erred in finding that she gave an informed consent to the spinal anesthesia prior to its administration.

This court was squarely confronted with the question of a patient's informed consent to a method or a course of treatment by medical personnel in *Natanson v. Kline*, 186 Kan. 393, 350 P. 2d 1093. That was an action for malpractice against a hospital and a physician in charge of its radiology department to recover for injuries sustained as a result of radiation therapy with radioactive cobalt, allegedly given in an excessive dosage. One of the plaintiff's contentions in *Natanson* was that while she consented to the treatment, the treating

physician failed to warn her the course of treatment he undertook to administer involved great risk of bodily injury or death.

After an extended review of cases from foreign jurisdictions most nearly in point, this court concluded the proper rule of law to determine whether a patient has given an intelligent consent to a purposed form of treatment by a physician was the rule stated and applied in *Salgo v. Leland Stanford Etc. Bd. Trustees* [1957], 154 Cal. App. 2d 560, 317 P. 2d 170. The trial court in *Salgo* gave a rather broad instruction on the duty of the physician to disclose to the patient "all the facts which mutually affect his rights and interests and of the surgical risk, hazard and danger if any". In holding the instruction to be overly broad, the California appellate court stated:

". . . A physician violates his duty to his patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an intelligent consent by the patient to the proposed treatment. Likewise the physician may not minimize the known dangers of a procedure or operation in order to induce his patient's consent. At the same time, the physician must place the welfare of his patient above all else and this very fact places him in a position in which he sometimes must choose between two alternative courses of action. One is to explain to the patient every risk attendant upon any surgical procedure or operation, no matter how remote; this may well result in alarming a patient who is already unduly apprehensive and who may as a result refuse to undertake surgery in which there is in fact minimal risk; it may also result in actually increasing the risks by reason of the physiological results of the apprehension itself. The other is to recognize that each patient presents a separate problem, that the patient's mental and emotional condition is important and in certain cases may be crucial, and that in discussing the element of risk a certain amount of discretion must be employed consistent with the full disclosure of facts necessary to an informed consent. . . ." (p. 578.)

This court commented further on the doctrine of informed consent in *Williams v. Menehan*, 191 Kan. 6, 379 P. 2d 292. There it was held the parents of a small child who died while a team of physicians was performing a cardiac catheterization had given an informed consent to the procedure. In commenting on the rule as laid down in *Natanson*, supra, it was said:

". . . [I]t is the duty of a doctor to make a reasonable disclosure to his patient of the nature and probable consequences of the suggested or recommended treatment, and to make a reasonable disclosure of the dangers within his knowledge which are incident or possible in the treatment he proposes to administer. But this does not mean that a doctor is under an obligation to describe in detail all of the possible consequences of treatment. To make a

complete disclosure of all facts, diagnoses and alternatives or possibilities which might occur to the doctor could so alarm the patient that it would, in fact, constitute bad medical practice." (p. 8.)

Summarizing the rule in *Tatro v. Lueken*, 212 Kan. 606, 512 P. 2d 528, the court said in Syllabi 3 and 4:

"In the absence of an emergency a physician or surgeon has a legal obligation to make a disclosure of the risks and dangers incident to a proposed medical or surgical procedure in order that his patient may make an informed consent thereto, but the duty of the physician is limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances.

"What is a reasonable disclosure upon which an informed consent may rest depends upon the facts and circumstances of each case."

Against this historical background of the rule the question now posed is whether or not a reasonable disclosure of the nature and probable consequences of the recommended spinal anesthesia was made to Mrs. Funke, and whether or not a reasonable disclosure was made to Mrs. Funke of the dangers, within the knowledge of Dr. Fieldman, which were incident or possible in the spinal anesthesia he proposed to administer.

At the time of trial the appellant testified:

"I knew before Dr. Fieldman came to see me that Dr. Cowles was a believer in the advantages of spinal anesthesia for the type of surgery I was going to have. I believed in and trusted Dr. Cowles; before when he delivered my child, he recommended a caudal anesthetic, but he didn't talk to me about possible complications and risks of the caudal. I didn't ask him before the delivery and I didn't feel that I should have had more information from him at that time.

"At the time I had the spinal anesthetic I did not feel I needed more information about it. If I had known then what I know about spinals or caudals now, I would never have gone through it.

"When I discussed the spinal anesthetic with Doctor Cowles, I did not have any questions as to the advantages and disadvantages. I always thought the doctor chose the anesthetic and the patient did not ever really have much to say. I was never asked before. Doctor Cowles had recommended the spinal anesthetic and it seemed satisfactory to me and I accepted Doctor Fieldman's recommendation for the spinal anesthetic."

On direct examination Mrs. Funke testified concerning the time Dr. Fieldman came into her hospital room on the evening of November 12, 1967, as follows:

"Q. All right. Now I ask you this question: up to that time had anyone in the world ever told you that a spinal anesthetic could cause a paralysis or a partial paralysis?

"A. No. I really didn't know anything about spinals. No one had ever told me.

"Q. All right. Had anyone ever told you that such a procedure could injure any part of your nervous system like the spinal cord, the nerve roots, or anything of that nature?

"A. No. The only thing I knew about a spinal was—I had heard women talk about the headaches from them. I was concerned about those.

"Q. Is that the only knowledge you've had is what you told the Court about here? Right now?

"A. Yes, sir.

"Q. When Dr. Fieldman walked into your room that night, did he introduce himself?

"A. Yes. He did. He said he was Dr. Fieldman. I believe we shook hands.

"Q. How long did he stay in the room there that evening?

"A. Well, he couldn't—it wasn't very long. I would say approximately three to four minutes at the most.

"Q. Did he give you a physical examination at that time?

"A. No, sir.

"Q. Did he interrogate you about any of your previous medical history?

"A. No. Not that I recall he didn't.

. . . . . . . . . . . . . .

"Q. Tell the Court what you said and what he said.

"A. He came in and introduced himself. I said well, I knew he was coming in. Dr. Cowles had mentioned he would be my anesthesiologist and that he would be in in a few minutes—in that evening. I told him Dr. Cowles had just left and he was very friendly. We exchanged, you know, hello. He asked me how I was and all this. Then he asked me what kind of anesthetic I wanted. I said well, Dr. Cowles had recommended a spinal; and he said, well, those are the best.

"He said I like to give those, too. He said the most you can get from them is a headache; and we have medicine for that now.

"Q. Was that the extent of his complete conversation in describing the procedure and what could happen there from it?

"A. That was about it.

"Q. Did Dr. Fieldman during this conversation at any time mention to you any possible consequence from spinal anesthetic?

"A. No, sir."

Dr. Fieldman takes the position, as the trial court found, that he was entitled to rely on the explanation given the patient by Dr. Cowles.

Dr. Cowles in his testimony was evasive as to what he told Mrs. Funke concerning a spinal anesthetic.

Did Dr. Cowles, the physician in charge, or Dr. Fieldman the anesthesiologist, have a duty to make a reasonable disclosure of the dangers of the proposed spinal anesthetic? We do not find it necessary to answer this question because the record clearly shows

Dr. Fieldman went to see Mrs. Funke in her hospital room the evening prior to her scheduled operation and *undertook* to tell Mrs. Funkee that "the most you can get from them [spinal anesthetic] is a headache; and we have medicine for that now".

This testimony was never refuted by Dr. Fieldman.

A careful examination of the record affirmatively shows there were other risks associated with the administration of a spinal anesthetic, and that one out of 55 people does have an abnormally low lying conus medullaris which makes such patient vulnerable to nerve injury if a spinal needle is inserted at L2-L3 interspace, rather than at the next lower interspace.

Dr. Fieldman recognized in his testimony, previously quoted, that if the initial tap is done higher than the L2-3 interspace there is danger of traumatizing the spinal cord which could cause nerve or spinal cord damage. With a low lying conus medullaris the same would be true of an initial tap made at L2-3. On the facts in this case the needle was withdrawn from the L2-3 interspace, where it was first inserted and some anesthetic solution injected after the patient twice indicated pain, and reinserted at the L3-4 interspace where the spinal anesthetic was finally administered.

Albert Faulconer, M. D., chairman of the Department of Anesthesiology at the Mayo Clinic in Rochester, Minnesota, replied to the question,

"Q. . . . [W]ouldn't it be a fair statement that that's not the only risk, there is an occasional headache. . . ?

"A. Yes, there certainly are other risks."

Frank M. Tilton, M. D., a physician and specialist in the field of neurology practice in Wichita, Kansas, testified that in his best medical judgment the conus medullaris would not ever go down to the second and third lumbar interspace and that he would not agree with Dr. Faulconer that in about two percent of the people the spinal cord ends below the L-2 interspace. However, after being cross-examined from the anatomical record, Dr. Tilton changed his testimony and agreed that in the big majority of people the end of the spinal cord would be at the L-1 or L-2 level of the spine.

The record establishes that Dr. Fieldman either knew or should have known that spinal anesthesia carried with it more risks than mere headaches for the patient, and that such other risks were greater in severity. When Dr. Fieldman then undertook to tell

Mrs. Funke that a headache was the only possible danger he misinformed and misled Mrs. Funke. In other words, her consent to the administration of a spinal anesthesia by Dr. Fieldman was not an informed consent. As such, it was a nullity.

In *Collins v. Meeker*, supra, the court said:

"At no time has this court ventured to say that a physician or surgeon is under obligation to disclose any and all results which might possibly follow a medical or surgical procedure. Nor would we now deny that there may well be circumstances under which it would be bad therapeutic practice to disclose the nature, the procedures and the possible harsh results of treatment. Even though a patient may be relieved of the burden of showing, by expert evidence, that his doctor's silence deviated from acceptable medical practice, there is nothing in this rule which would preclude the doctor, himself, from showing that his silence did, in fact, comply with medical standards under the facts then facing him. . . ." (p. 397.)

But we are not here faced with total silence on the part of a physician, or a failure to make a disclosure that would deviate from acceptable medical practice. Here we are confronted with a misleading statement by Dr. Fieldman upon which Dr. Fieldman knew Mrs. Funke was relying when she gave her consent for the spinal anesthetic. As such, the misleading statement was equivalent to a false statement by Dr. Fieldman and vitiated Mrs. Funke's consent.

While there does not necessarily have to be negligence in the administration of the spinal anesthetic for the resultant damage which Mrs. Funke experienced, the risk was still present.

On the record here presented we find Dr. Fieldman failed to obtain the informed consent of Mrs. Funke to the spinal anesthetic prior to its administration.

No more than breach of any other legal duty does nonfulfillment of the physician's obligation to disclose alone establish liability to the patient. An unrevealed risk that should have been made known must materialize, otherwise the omission, however unpardonable, is legally without consequence. Occurrence of the risk must be harmful to the patient, for negligence unrelated to injury is nonactionable. And, as in malpractice actions generally, there must be a causal relationship between the physician's failure to adequately divulge the risks and damage to the patient. (*Canterbury v. Spence*, 464 F. 2d 772 [1972].)

A causal connection exists when, but only when, disclosure of significant risks incidental to treatment would have resulted in a

decision against it. The patient obviously has no complaint if she would have submitted to the spinal anesthetic notwithstanding awareness that the risk of permanent nerve damage was one of its perils. On the other hand, the very purpose of the disclosure rule is to protect the patient against the consequences which, if known, she would have avoided by foregoing the spinal anesthetic. (*Canterbury v. Spence,* supra, and *Natanson v. Kline,* 186 Kan. 393, 350 P. 2d 1093.)

This court said in *Natanson v. Kline,* supra:

"Upon the record here presented Dr. Kline made no disclosures to the appellant whatever. He was silent. This is not to say that the facts compel a verdict for the appellant. Under the rule heretofore stated, where the patient fully appreciates the danger involved, the failure of a physician in his duty to make a reasonable disclosure to the patient would have no causal relation to the injury. In such event the consent of the patient to the proposed treatment is an informed consent. The burden of proof rests throughout the trial of the case upon the patient who seeks to recover in a malpractice action for her injury." (p. 410.)

The factual issue on causal connection has not heretofore been determined by this court, except to say the burden of proof rests on the patient throughout the trial of a malpractice action. Should the issue be determined on an objective or a subjective basis? The point was fully discussed in *Canterbury v. Spence,* supra, where the United States Court of Appeals, District of Columbia Circuit, concluded the objective basis was the better. There the court said:

". . . The more difficult question is whether the factual issue on causality calls for an objective or a subjective determination.

"It has been assumed that the issue is to be resolved according to whether the factfinder believes the patient's testimony that he would not have agreed to the treatment if he had known of the danger which later ripened into injury. [Citing authorities.] We think a technique which ties the factual conclusion on causation simply to the assessment of the patient's credibility is unsatisfactory. To be sure, the objective of risk-disclosure is preservation of the patient's interest in intelligent self-choice on proposed treatment, a matter the patient is free to decide for any reason that appeals to him. [Citing authorities.] When, prior to commencement of therapy, the patient is sufficiently informed on risks and he exercises his choice, it may truly be said that he did exactly what he wanted to do. But when causality is explored at a post-injury trial with a professedly uninformed patient, the question whether he actually would have turned the treatment down if he had known the risks is purely hypothetical: 'Viewed from the point at which he had to decide, would the patient have decided differently had he known something he did not know?' [Citing authorities.] And the answer which the patient supplies hardly represents more than a guess, perhaps tinged by the circumstance that the uncommunicated hazard has in fact materialized. [Citing authorities.]

"In our view, this method of dealing with the issue on causation comes in second-best. It places the physician in jeopardy of the patient's hindsight and bitterness. It places the factfinder in the position of deciding whether a speculative answer to a hypothetical question is to be credited. It calls for a subjective determination solely on testimony of a patient-witness shadowed by the occurrence of the undisclosed risk. [Citing authorities.]

"Better it is, we believe, to resolve the causality issue on an objective basis: in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance. [Citing authorities.] If adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm, causation is shown, but otherwise not. [Citing authorities.] The patient's testimony is relevant on that score of course but it would not threaten to dominate the findings. And since that testimony would probably be appraised congruently with the factfinder's belief in its reasonableness, the case for a wholly objective standard for passing on causation is strengthened. Such a standard would in any event ease the fact-finding process and better assure the truth as its product." (pp. 790, 791.)

We think the foregoing reasoning is persuasive. Whether a patient would have refused treatment or a medical procedure had the physician made adequate disclosure is to be determined objectively. If adequate disclosure could reasonably be expected to have caused the patient to decline the treatment or procedure because of revelation of the kind of risk or danger which resulted in her harm, causation is shown but otherwise not, and the patient's testimony is relevant on such issue, but should not be controlling.

The appellant's third point is that the trial court erred in finding the doctrine or *res ipsa loquitur* was not applicable to this case.

The doctrine of *res ipsa loquitur* and the elements thereof were examined as applied to malpractice cases in *Voss v. Bridwell*, 188 Kan. 643, 364 P. 2d 955, and reviewed in *Tatro v. Lueken*, 212 Kan. 606, 512 P. 2d 529, together with our prior decisions on the subject.

In *Tatro* the court held, consistent with our prior decisions, that the doctrine of *res ipsa loquitur* applies in a medical malpractice action only where a layman is able to say as a matter of common knowledge and observation, or from the evidence can draw an inference, that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised.

In *Tatro*, which was a malpractice action based upon the occurrence of a vesicovaginal fistula following an abdominal hysterec-

tomy, it was held that such operation is so complicated as to lie beyond the realm of common knowledge and experience of laymen as to whether such result would not ordinarily occur in the absence of negligence.

The law on the doctrine of *res ipsa loquitur* need not be further reviewed in connection with malpractice actions in this opinion. The reader is referred to *Tatro v. Lueken,* supra.

In our opinion the administration of spinal anesthesia which results in permanent nerve damage to the patient is a procedure so complicated, considering the delicate anatomy of the human spine and the various possibilities of injury from the needle or anesthetic solution, as to lie beyond the realm of common knowledge and experience of laymen as to whether such result would not ordinarily occur in the absence of negligence.

The judgment of the lower court is reversed with directions to grant a new trial in accordance with the views expressed in this opinion.