Joseph DESSI, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 78–180–N.

United States District Court,
E. D. Virginia,
Norfolk Division.

April 29, 1980.

David K. Sutelan, Norfolk, Va., for plaintiff.

Michael A. Rhine, Asst. U. S. Atty., Norfolk, Va., for defendant.

## OPINION

WALTER E. HOFFMAN, District Judge.

This medical malpractice case arises under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* Plaintiff claims he was rendered impotent as the result of an operation performed by a government physician at the United States Public Health Service Hospital in Norfolk, Virginia. Although the plaintiff does not contend that the operation was negligently performed, he claims that (1) he should have been informed of the risks associated with such an operation, and (2) the operation was not necessary. Defendant, in addition to a general denial of the allegations of negligence, interposes the statute of limitations as a bar to this action.

### I.

Plaintiff, Joseph Dessi, is a retired chief petty officer of the United States Navy. After his retirement from the Navy in 1963,

plaintiff sought medical attention on numerous occasions at the Public Health Service Hospital (hereinafter "PHSH") in Norfolk. In February, 1972, plaintiff, then of the age of 52½ years, complained to Dr. Robert C. Pickens of the PHSH Urology Clinic of an increasing strain to urinate. After a review of plaintiff's hospital medical records,[1] Dr. Pickens recommended that plaintiff enter the hospital for a cystoscope examination.[2] The examination, performed by Dr. Pickens on April 6, 1972, revealed a trabeculated bladder which suggested that small obstructing tissue in the middle lobe of the prostate gland was causing the strain in urination. On the basis of the patient's complaints, medical history and lab reports, Dr. Pickens diagnosed the condition as benign prostatic hypertrophy. To correct this obstructing tissue, Dr. Pickens recommended a transurethral resection of the prostate (TUR). Plaintiff agreed to the operation, which was performed without incident on April 11, 1972.

Prior to his discharge from the hospital, plaintiff was informed by Dr. Pickens that he should not engage in sexual intercourse for thirty days. According to the plaintiff, some two weeks after the thirty days had expired, he attempted sexual intercourse with his wife, but could not achieve an erection. Plaintiff testified, as did his wife, that he has been unable to achieve an erection since the operation, but that prior to the operation, his sexual relations were normal.

## II.

Initially, we must determine whether plaintiff's claim is barred by the statute of limitations. 28 U.S.C. § 2401(b) provides, in part:

A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues . . . .

Plaintiff filed his administrative claim on April 1, 1977. Therefore, if the cause of action accrued before April 1, 1975, plaintiff may not maintain this action.

■ The question as to when a claim accrues under the Federal Tort Claims Act was recently considered by the Supreme Court in *United States v. Kubrick*, 444 U.S. 111 (1979), 100 S.Ct. 352, 62 L.Ed.2d 259 (Nov. 27, 1979).[3] The court held that a claim accrues within the meaning of the Act when the plaintiff knows, or in the exercise of reasonable diligence, should have known both the existence and the cause of his injury.[4] This decision signifies a retreat from the expansive view of "accrual" previously adopted by a number of the circuits, including the Fourth Circuit. Before *Kubrick*, the rule in the Fourth Circuit was that an action did not accrue "until a claimant has had a reasonable opportunity to discover all of the essential elements of a possible cause of action—duty, breach, causation, damages . . . ." *Bridgford v. United States*, 550 F.2d 978, 981–82 (4th Cir. 1977). *See: DeWitt v. United States*, 593 F.2d 276 (7th Cir. 1979); *Exnicious v. United States*, 563 F.2d 418, 420 (10th Cir. 1977); *Jordan v. United States*, 503 F.2d 620 (6th Cir. 1974).

■ Mr. Justice White, writing for the *Kubrick* majority, noted that once armed with knowledge of his injury and its cause, a reasonable claimant should then seek ad-

1. Plaintiff, on two previous occasions, in 1969 and 1971, was admitted to the PHSH for cystoscope examinations. Both tests were conducted in response to plaintiff's urinary complaints and laboratory tests which indicated microscopic blood deposits in his urine. The second test disclosed a large prostate gland and a small amount of blockage in the urethra.

2. A cystoscope is an instrument that permits an interior visualization of the bladder and urethra.

3. The opinion in *Kubrick* was published after the trial of this case and after counsel had submitted briefs. The court brought this case to the attention of counsel and supplemental briefs were filed.

4. The Supreme Court, in *Kubrick*, did not use this precise language but as we analyze same, it is apparent that actual knowledge is not required and constructive knowledge is sufficient.

vice as to whether he has a possible cause of action. It may be that a claimant would find that his injury was negligently inflicted—but the running of the statute of limitations does not await this determination. Knowledge of an injury and its cause should trigger an inquiry into whether the claimant's legal rights were violated. In the circuit court opinion in the *Kubrick* case, the Third Circuit used the *Jordan* case, *supra*, as an example of why it felt it was necessary to toll the statute until a claimant has knowledge of all the elements of his cause of action. The Third Circuit noted:

> For example, the plaintiff in *Jordan*, whose eye was injured as a result of his sinus operation, may very well have believed that such eye involvement was an unavoidable result of the operation, and indicated no impropriety in the manner of treatment. In such a case, the cause of action for medical malpractice should not accrue upon mere knowledge of causation. Something more should be required.

Although the Supreme Court did not specifically mention this passage, it is clear by its holding that nothing more than knowledge of injury and causation is required for the cause of action to accrue. The action accrues even if the claimant believes that his injury was unavoidable and did not indicate negligent treatment. It is the plaintiff's burden, once he knows of his injury and its cause, to determine within the limitations period whether or not to file suit.

The evidence in this case indicates that plaintiff knew or reasonably should have known before April, 1975, that his impotence was related to the TUR performed by Dr. Pickens in 1972. His testimony was that he and his wife had a relatively frequent sexual relationship which ceased altogether after the operation. Although he may have initially attributed his sexual dysfunction to a longer than normal recuperative period, at some time before April, 1975, plaintiff clearly associated his impotence with the 1972 operation. Such knowledge would have led a reasonable man to conclude that he was impotent as the result of the TUR.

Plaintiff argues that, at most, he knew there was a "distinct possibility" that his impotence was caused by the operation. Citing *Portis v. United States*, 483 F.2d 670 (4th Cir. 1973), he contends that such knowledge is not sufficient to start the running of the statute of limitations.

*Portis* involved the negligent administration of a drug (Neomycin) which severely damaged the plaintiff's auditory nerve. As plaintiff was an infant, her hearing impairment was not discovered until her age-three hearing tests, approximately two years after administration of the drug. Prior to these tests, plaintiff was frequently ill with ear, throat and respiratory infections, including pneumonia and tonsilitis. During the next five years plaintiff underwent extensive examination and treatment. However, none of the seven physicians who examined the child during this period diagnosed the cause of the hearing loss. Plaintiff's mother was informed that the deafness could have been caused by ear infections, high fever or the Neomycin injections. Finally, in 1969, a doctor diagnosed plaintiff's condition as a profound neurosensory hearing loss related to Neomycin toxicity. Plaintiff promptly filed suit.

The district court found that in 1963 Mrs. Portis knew there was a distinct possibility of future hearing loss as a result of the malpractice and therefore dismissed the action as barred by the statute of limitations. The Fourth Circuit decision, reversing the district court, suggests that knowledge of a "distinct possibility" of a causal relationship is not sufficient for accrual purposes. The court noted:

> What is important here is that no one, neither layman nor doctor, diagnosed the hearing difficulty as being caused, or even probably caused, by the 1963 malpractice until 1969. 483 F.2d at 673.

Despite a diligent effort to determine the cause of the child's injury, before 1969 her parents only knew that the deafness may have been the result of any of three events. Such "blameless ignorance", the court felt, should not prevent the right of action

against the Government. *Urie v. Thompson*, 337 U.S. 163, 170, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949). The court extended the "discovery rule" of *Young v. Clinchfield R. R.*, 288 F.2d 499, 503 (4th Cir. 1961)—a cause of action accrues only when the plaintiff has reason to know he has been injured—to cover those cases where the cause of the injury was neither known nor reasonably detectable. 483 F.2d at 673.

In the instant case, plaintiff argues that he, like the plaintiff in *Portis*, had only incomplete knowledge of what caused his injury. That he may have associated his impotency with the TUR is not enough, he contends, to constitute knowledge of causation. This argument assumes, however, that plaintiff was diligent in attempting to discover what caused his impotency.

Plaintiff testified that after the operation he complained to several PHSH doctors of his inability to engage in sexual intercourse. He insists that, on each occasion, the doctor would ignore the complaint or assure him that the problem would work itself out. The first complaint of impotency noted in plaintiff's PHSH record is dated August, 1975. Between his operation in April, 1972, and this entry, plaintiff was seen twenty-three times by five different doctors in the PHSH Urology Clinic. He asserts that he complained to each of these doctors about his impotency, although not at every appointment. We cannot accept this testimony.

Primarily, we rely on the lack of any entry in the medical record concerning sexual complaints prior to August, 1975. Dr. Pickens, who saw plaintiff at nine post-operative appointments, did not remember plaintiff making any such complaints. It is clear that had such a complaint been made, it would have been noted in plaintiff's record. Furthermore, we note plaintiff's failure to ever schedule an appointment with a physician specifically to discuss his sexual problems. He testified that he only mentioned this complaint occasionally in his hospital-initiated follow-up visits. Had plaintiff ever consulted a physician specifically about his impotency, or indeed if he ever complained of his problem in one of his twenty-three post-operative appointments, we believe he would have discovered that his impotency was probably caused by the 1972 TUR operation.[5] Here the cause of the injury was reasonably detectable and only plaintiff's failure to make diligent inquiries of his doctors prevented him from obtaining this knowledge. This is not the sort of "blameless ignorance" the relaxed rules of accrual in Federal Tort Claims Act claims are designed to excuse. We find, therefore, that prior to April 1975, plaintiff knew or reasonably should have known that his injury was the result of his TUR. As plaintiff had knowledge of both his injury and its cause before April, 1975, we hold, under *Kubrick*, that plaintiff's action accrued more than two years before he filed his claim and thus this suit is barred by the statute of limitations.

### III.

Although we have determined that plaintiff's action is barred by the statute of limitations, we will nevertheless consider

---

5. If plaintiff had made these inquiries, we believe he also would have discovered that impotency is a known slight risk in the TUR procedure. Plaintiff contends that as this is an action under the informed consent doctrine, knowledge of causation must be measured in light of the difference between causation in a standard malpractice case and causation under informed consent. A causal link exists between the failure to disclose material risks and the patient's injury if it is established that had plaintiff known of the risks, he would not have consented to the treatment. *Canterbury v. Spence*, 464 F.2d 772, 790 (D.C. Cir. 1972), see discussion of causation, *infra*, Part III. Thus,

plaintiff argues, the cause of action did not accrue under the *Kubrick* rule until he learned that impotency was a known risk in a TUR. This is the point at which plaintiff was aware of the "cause" of his injury—that he would not have allowed the operation had he been informed of this risk. Plaintiff claims he did not learn of the impotency risk until his consultation with Dr. Timens in October, 1976.

Whatever may be the merits of plaintiff's argument, we nevertheless find that he reasonably should have known that impotency was a risk in a TUR at sometime before April, 1975 and, in all probability, at a much earlier date.

the merits of his claims. Under the Federal Tort Claims Act, liability of the United States is "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, and is to be determined "in accordance with the law of the place where the act or omission occurred", 28 U.S.C. § 1346(b). As the allegedly negligent acts and/or omissions occurred at the Public Health Service Hospital in Norfolk, the law of Virginia is applicable to this action. *Sawyer v. United States*, 465 F.Supp. 282, 285 (E.D.Va.1978).

### A. *Informed Consent*

■ Virginia has long recognized the duty of a physician "in the exercise of ordinary care to warn a patient of the danger of possible bad consequences of using a remedy." *Hunter v. Burroughs*, 123 Va. 113, 133–34, 96 S.E. 360, 366–67 (1918). This duty arises from the sound principle that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body . ." *Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 105 N.E. 92, 93 (1914). This doctrine of informed consent requires a physician to disclose to his patient the alternatives to and risks of a particular treatment, so as to enable the patient to intelligently decide whether or not to undergo such treatment. *Bly v. Rhoads*, 216 Va. 645, 648, 222 S.E.2d 783, 785 (1976); *see Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014 (1977).

■ Although in a few jurisdictions performance of surgery without obtaining the informed consent of the patient is actionable under an assault and battery theory[6], it is clear that in Virginia the action is one for negligence in failing to adhere to the proper standard of care. *Bly v. Rhoads,*

---

6. *Fogal v. Genesee Hospital*, 41 A.D.2d 468, 344 N.Y.S.2d 522, 559 (1973); *Gray v. Grunnagle*, 423 Pa. 144, 223 A.2d 663 (1966); *Belcher v. Carter*, 13 Ohio App.2d 113, 234 N.E.2d 311 (1967); *see* Prosser, *Torts* (4th ed. 1971) pp. 165–66.

7. *Accord: Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014 (1977); *Cobbs v. Grant*, 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1 (1972); *Mason v.*

*supra; Lane v. United States*, 225 F.Supp. 850 (E.D.Va.1964).[7] As in any other action based upon alleged negligence, the plaintiff must establish: (1) the existence of a duty; (2) breach of that duty; (3) proximate cause and (4) injury. We will consider each of these elements separately.

### 1. *Duty*

■ In *Bly v. Rhoads, supra*, the Virginia Supreme Court held that a physician's duty to disclose and the extent of disclosure under the doctrine of informed consent are governed by the standards of due medical care in the same or a similar community. The court further held that the standard of care must be established by expert medical testimony. 216 Va. at 649–652, 222 S.E.2d 783.

In the instant case, experts for both parties testified that, in 1972, the state of medical knowledge was such that urologists of reasonable skill were aware that impotence was a slight risk in the performance of a TUR. In addition, the expert testimony established that prevailing medical standards required disclosure of such a risk to a patient before surgery. Defendant admits the existence of the duty of disclosure in this case.

### 2. *Breach of Duty*

Plaintiff testified that he was never informed by Dr. Pickens or any other member of the staff at the PHSH of any risks associated with a TUR. His recollection was that he merely inquired whether, if the doctor was in plaintiff's position, he would consent to the operation. He placed full faith in Dr. Pickens' opinion that he should have the surgery.[8]

---

*Ellsworth*, 3 Wash.App. 298, 474 P.2d 909 (1970); *see* Capron, *Informed Consent in Catastrophic Disease Research and Treatment*, 123 U.Pa.L.Rev. 340 (Dec.1974).

8. Prior to the operation plaintiff signed a standard consent form. The form was phrased in general terms and is clearly not sufficient to discharge the physician's duty of disclosure.

Not surprisingly, Dr. Pickens did not recall any conversations he may have had with plaintiff about the various risks posed by a TUR. He did testify, however, that without exception, his practice was to inform his patients of the slight risk of post-TUR impotency. He noted that, in his training at the Columbia Presbyterian Medical Center, great emphasis was placed on the necessity of informing potential TUR patients of dangers in the procedure, including infection, bleeding, possible changes in potency, and the inevitable result of retrograde ejaculation. Dr. Pickens was also taught to make notes in the medical records of his disclosures to patients prior to surgery, although he testified that in 1972 this was not his usual practice.

On the balance, we are convinced that the factual inference of non-disclosure weighs in plaintiff's favor. While plaintiff testified unequivocally that there were no discussions of possible ill-effects, Dr. Pickens could only testify as to his usual practice. We realize that it is difficult to remember specific conversations held with a patient seven years earlier, especially considering that Dr. Pickens undoubtedly consulted with numerous patients every day, but we must credit plaintiff's testimony in this instance. Surgery is a routine matter for most physicians, whereas to the patient it represents a significant decision. Clearly, in a non-emergency situation such as this, the physician would not recall events leading up to surgery as vividly as the patient.

Furthermore, we are concerned that plaintiff's medical record is devoid of references to disclosures made to the patient. Dr. Pickens testified that, although it was not his practice in 1972 to record disclosures to patients, he now personally inserts such a notation in each patient's record. This fact may not be relevant in determining whether Dr. Pickens made any disclosures to plaintiff, but it does indicate the increased awareness of the legal importance of "informed consent" by the medical profession.

While we do not mean to suggest that Dr. Pickens is other than a highly skilled and knowledgeable physician, the failure to inform a patient of the risk of post-TUR impotency in 1972 was not such a question of concern within the medical community as it is today.

Accepting the testimony of plaintiff in this regard, we accordingly hold that Dr. Pickens, as defendant's employee, breached his duty of informing plaintiff prior to surgery of the risk of impotency following a TUR.

### 3. *Proximate Cause*

Although the courts of Virginia have recognized the doctrine of informed consent, and have defined the scope of the physician's duty of disclosure, *Bly v. Rhoads, supra,* there is no Virginia authority discussing the appropriate test for proving the causal connection between the failure to disclose and any resulting injury or damage. In the absence of any Virginia case on point, we must predict what the Supreme Court of Virginia would decide if the case was before it. *Nature Conservancy v. Machipongo Club, Inc.,* 579 F.2d 873, 875 (4th Cir. 1978), *cert. denied* 439 U.S. 1047, 99 S.Ct. 724, 58 L.Ed.2d 706.

Proximate cause in an action under the doctrine of informed consent is based on the "but for" notion of causation; i. e., the defendant's conduct is not a cause of the event if the event would have occurred without it. Prosser, *Torts* (4th ed. 1971) p. 239. The plaintiff, therefore, must show that had he known of the risk, he would not have consented to the treatment.[9] *Canterbury v. Spence,* 464 F.2d 772, 790 (D.C.Cir. 1972); *Sard v. Hardy, supra; Scaria v. St. Paul Fire & Marine Ins. Co.,* 68 Wis.2d 1, 227 N.W.2d 647 (1975); *Funke v. Feldman,* 212 Kan. 524, 512 P.2d 539 (1973); *Cobbs v. Grant,* 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1, 11 (Sup.Ct.1972); *Wilkinson v. Ves-*

---

**9.** This is assuming that plaintiff is in fact impotent. An unrevealed risk that should have been made known must materialize, for otherwise the omission, however unpardonable, is legally without consequence. *Canterbury v. Spence,* 464 F.2d 772, 790 (D.C.Cir.1972). We will discuss plaintiff's injury in the next section.

*ey,* 110 R.I. 606, 295 A.2d 676, 690 (1972); *Miller v. Kennedy,* 11 Wash.App. 272, 522 P.2d 852, 864 (1974). A question exists, however, whether causation should be measured by a subjective standard—what the patient himself would have done had adequate disclosure been made—or an objective standard—what a reasonable person would have decided had he known of the risk as contrasted with the pain and discomfort in not permitting the operation.

Support for the subjective theory derives from the broad principle underlying informed consent that a man is the master of his own body and may do with it whatever he wishes, however irrational. To inject a reasonable man standard into this determination arguably undermines the patient's right to make his own decision.[10] While this is a theoretically appealing rationale, it ignores the practical problem with reliability of proof. Acceptance of the subjective standard would make the plaintiff's testimony as to what he hypothetically would have done conclusive, except for a determination of his credibility. *Sard v. Hardy, supra.* Clearly, a plaintiff injured by an undisclosed risk would subjectively believe, with the benefit of 20/20 hindsight, that he would not have allowed the operation had disclosures been made. *Cobbs v. Grant, supra,* 104 Cal.Rptr. 505, 502 P.2d at 11.

 The majority rule, and the rule we believe the Virginia Supreme Court would adopt, is that causation in informed consent cases is to be determined by an objective standard—what would a prudent person in plaintiff's position have decided if adequately informed of all material risks? *Karp v. Cooley,* 493 F.2d 408, 422 n. 18 (5th Cir. 1974), *cert. denied* 419 U.S. 845, 95 S.Ct. 79, 42 L.Ed.2d 73; *Canterbury v. Spence, supra,* 464 F.2d at 791; *Bowers v. Garfield,* 382 F.Supp. 503, 506 (E.D.Pa.1973); *Sard v. Hardy, supra,* 379 A.2d at 1025; *Scaria v. St. Paul Fire & Marine Ins. Co., supra,* 227 N.W.2d at 655; *Funke v. Feldman, supra,* 512 P.2d at 550; *Cobbs v. Grant, supra,* 104

Cal.Rptr. 505, 502 P.2d at 11; *Fogal v. Genesee Hospital, supra,* 344 N.Y.S.2d at 560; see *Watson v. Clutts,* 262 N.C. 153, 136 S.E.2d 617, 622 (1964). The plaintiff's testimony is certainly relevant on this point, but it will be assessed under a reasonableness standard. The trier of fact must objectively weigh the necessity for the operation against the incidence of risk in a particular treatment and the severity of the potential injury; e. g., would a reasonable patient choose to live with the pain and discomfort the surgery is designed to alleviate rather than take the risk that unavoidable complications may occur?

 In the instant case, plaintiff testified, over objection, that if he had been informed of the chance of impotence following the TUR, he would not have authorized the operation. We are convinced, however, that a reasonable person in plaintiff's position would have had the operation despite the risks involved.

All of the experts in this case testified that impotence occurs in a small percentage of patients following a TUR. These doctors could only speculate as to what aspect of a TUR causes impotence, although they seemed to agree that the condition is usually psychogenic, rather than organic. The evidence suggests that the patient's prior sexual ability and mental preparedness for surgery are crucial factors in cases of post-TUR impotence. Two urologists, Drs. Decker and Poutasse, testified that, if a patient enjoys a regular sex life before the operation, in most instances, he will be potent thereafter. However, if a man is experiencing problems with his sexual ability, a TUR may be enough to render him totally impotent. Therefore, both doctors attempt to determine prior to the operation the level or frequency of sex the patient enjoys and then advise him accordingly of the risks involved.

A patient, such as plaintiff, who stated that he was well-adjusted sexually prior to his operation, would be informed that al-

---

**10.** Capron, *Informed Consent in Catastrophic Disease Research and Treatment,* 123 U.Pa.L. Rev. 340, 419 (Dec.1974).

though there is a small risk of impotence, the chances are overwhelming that he will be able to engage in sexual activities as before, except that he will most likely experience a "dry climax".[11]

Although we recognize that impotence is a sufficiently severe consequence to force a patient to take a second look at the necessity for an operation, we do not believe that a reasonable patient in plaintiff's position would forego the operation for fear that the risk would materialize.

Plaintiff's medical record indicates that his prostate condition was progressively deteriorating. Any further delay in correcting this problem could only lead to increased pain and discomfort. Rather than continue to suffer painful urination or take the risk that his condition could not be fully corrected at a later date, we believe that a reasonable patient would accept the physician's reassurances about the slight chances of impotency and agree to the operation. Therefore, we find that plaintiff has failed to establish the causal link between the failure to inform and his injury.

### 4. Injury

Plaintiff claims he is now totally impotent and has been since his operation in April, 1972. There is no doubt that plaintiff has a serious and most unfortunate problem. Whether he is in fact impotent and, if so, whether his injury was caused by the operation performed by Dr. Pickens are questions to which we now turn.

At the outset we should note that plaintiff clearly is not organically or physically impotent. In November, 1978, plaintiff submitted to a Nocturnal Penile Tumescent study (NPT), a test which is designed to distinguish organic impotence from psychogenic impotence. The test is premised on the fact that all males have six to eight erections each night during the rapid eye movement (REM) cycle of sleep. Pressure transducers applied to the penis can thus indicate whether the subject is physically able to achieve an erection. The data from plaintiff's test shows that on two successive nights, he had more than one erection of significant duration. The experts agreed that these results effectively rule out any organic basis for plaintiff's complaint.

To determine if plaintiff is psychogenically impotent we must rely to a great extent on the testimony of Drs. Decker, Timens, and Iglecia. Each of these physicians consulted with plaintiff and evaluated his problem. At trial, they expressed their opinion that plaintiff is indeed psychogenically impotent.

Diagnosis of a subjective condition such as psychogenic impotence depends to a great degree upon the history and symptoms related to the physician by the patient. See Kaufman v. Kaufman, 164 F.2d 519, 520 (D.C.Cir.1947). The patient's credibility is thus an important consideration in the physician's evaluation of the complaint. The doctors who examined plaintiff related that they believed plaintiff's history of adequate sexual ability prior to the operation and were careful to point out that this history was corroborated consistently by Mrs. Dessi. Perhaps the most extensive cross-checking of plaintiff's sexual history was conducted by Dr. Raymond Iglecia and his wife, Yvette, a certified sex therapist, at the Center Psychiatrists in Portsmouth. Through in-depth questionnaires and individual consultation of the Dessis, the Iglecias concluded that, although plaintiff functioned adequately before the operation, he is now totally impotent. We accept the conclusions of Drs. Timens, Decker and Iglecia, and therefore find that plaintiff is currently psychogenically impotent.

The above physicians also testified that, in their opinion, plaintiff's impotence is probably the result of the 1972 TUR.[12] We

---

11. A "dry climax" or, as it is known medically, retrograde ejaculation, is a common side-effect of a properly performed TUR.

12. A medical opinion that an injury was probably caused by a certain procedure is sufficient in the absence of evidence of an equally probable cause. See Hunter v. Burroughs, 123 Va. 113, 96 S.E. 360 (1918); Dietze v. King, 184 F.Supp. 944 (E.D.Va.1960); Morgenroth v. Pacific Medical Center, Inc., 54 Cal.App.3d 521, 126 Cal.Rptr. 681 (1976).

would accept this collective opinion without reservation, were it not for certain entries in plaintiff's Navy record which indicates that he has made prior complaints about impotency. In both 1956 and 1959, plaintiff complained to Navy physicians of an inability to have an erection. The wording of the entries suggest that plaintiff's problem was not an isolated instance.[13] Plaintiff does not recall these former bouts with impotency, although he does not deny them.

Drs. Decker and Iglecia testified that, even if plaintiff experienced trouble with his sexual potency in the late 1950's, this would not alter their opinion that plaintiff's present impotence was caused by the 1972 operation. In fact, these prior instances reinforced Dr. Decker's opinion. He explained that these instances of impotency, coupled with plaintiff's history of depression in the 1960's, made plaintiff a prime candidate for sexual problems following a TUR. The suggestion is that self-doubts which may have brought about problems in the past may have been revived by the TUR. The doctors also indicated that the former problem may have been related to heavy drinking and anxiety plaintiff was experiencing at the time but which had passed by 1972.

In the absence of any evidence or inference to the contrary, we feel bound to accept the conclusions of these physicians that plaintiff is impotent as the result of the 1972 TUR.

B. *Unnecessary Surgery*

Plaintiff further claims that Dr. Pickens was negligent in proposing and performing an unnecessary surgical procedure. Although plaintiff does not specifically question Dr. Pickens' diagnosis of benign prostatic hypertrophy, he contends that his symptoms and complaints and the laboratory findings would not have led a prudent urologist in this community to recommend a TUR.

While we are reluctant to recognize this theory of medical malpractice in the absence of any Virginia authority on point, we believe that in any event plaintiff has not established that the surgery was unnecessary.

Plaintiff's expert, Dr. Decker, testified that in light of the few subjective complaints of the patient and the paucity of objective evidence, he did not believe surgery was warranted in this case. Dr. Poutasse, an equally eminent urologist called by the government, reviewed the same medical record as Dr. Decker and reached a contrary conclusion. In addition, Dr. Pickens testified as to the factors which convinced him that plaintiff should submit to a TUR.

The difference of opinion in the testimony of these physicians rests on their varying interpretations of the objective evidence contained in plaintiff's medical record. The evidence clearly shows that plaintiff was experiencing some trouble with his prostate, the only question being whether this was so advanced as to require surgery. Considering the number of plaintiff's visits to the PHSH Urology Clinic between 1969 and 1972, the two prior cystoscope examinations which indicated growth of obstructing tissue in the medium lobe of the prostate, the plaintiff's history of urinary tract infections, and the documentation of plaintiff's complaints in the PHSH record, we are inclined to agree with Drs. Poutasse and Pickens that a TUR was a proper recommendation in this case. Accordingly, we find that Dr. Pickens was not negligent in proposing and performing the TUR, and the operation was necessary.

In light of these findings and conclusions, we find that (1) the statute of limitations bars plaintiff claim, and (2) the operation was reasonably necessary, irrespective of the slight possibility of the side effect of impotency and was, therefore, not a proximate cause.

The Assistant United States Attorney will prepare an appropriate judgment order

---

**13.** The 1956 entry noted: "For several months, patient has complained of inability to have erection . . . ." The 1959 entry read: "[patient] continues to have insomnia and inability to have erection."

for endorsement by counsel by plaintiff and presentation to the Court for entry.