479 So.2d 1150 (1985)
L. Duncan FAIN and Jean Fain
v.
Dr. R.T. SMITH and Dr. Bryan C. Delaney.
84-138.
Supreme Court of Alabama.
September 6, 1985.
Rehearing Denied November 8, 1985.
*1151 John W. Haley of Hare, Wynn, Newell & Newton, Birmingham, for appellants.
Ralph H. Ford of Ford, Caldwell, Ford & Payne, Huntsville, for appellee Dr. R.T. Smith.
W. Stancil Starnes and W. Hill Sewell of Starnes & Atchison, Birmingham, for appellee Dr. Bryan C. Delaney.
PER CURIAM.
The plaintiffs appeal from a judgment entered on a jury verdict in favor of the defendant physicians in a medical malpractice case.
The Fains brought the action against Doctors Delaney and Smith, charging that each of them negligently failed to inform plaintiff-patient Duncan Fain of the risks involved in the performance of a pulmonary arteriogram by Dr. Smith. Jean Fain's claim is for loss of consortium. The plaintiffs charge that they were injured on April 2, 1980, when Duncan Fain's heart was punctured during the procedure. The plaintiffs also assert that Dr. Smith was instructed to terminate the procedure prior to the time the patient's heart was punctured.
*1152 The trial judge, in permitting the case to go to the jury, anticipated that this court would, although it has not heretofore expressly said it would, recognize a cause of action for medical malpractice where a physician fails to get the informed consent of the patient. He also correctly held that whether the physicians had disclosed all of the material risks of the procedure was a factual issue to be resolved by the jury, and that the test for the determination of that issue was a professional one, i.e., whether the physicians had disclosed all the risks which a medical doctor practicing in the same field and in the same community would have disclosed. Expert testimony is required to establish what the practice is in the general community. This was supplied in this case.
We think the legislature has adopted the traditional view that the doctor's duty to get the informed consent of the patient must be measured by a professional medical standard.
Section 6-5-484, Ala.Code 1975, provides:
"In performing professional services for a patient, a physician's, surgeon's or dentist's duty to the patient shall be to exercise such reasonable care, diligence and skill as physicians, surgeons, and dentists in the same general neighborhood, in the same general line of practice, ordinarily have and exercise in a like case."
The trial court, therefore, correctly charged the jury:
"Now, applying the standard to the facts of this case, it can be said that the Law of Alabama required Dr. Delaney and Dr. Smith to exercise the same reasonable care, diligence and skill in disclosing the material risks associated with a pulmonary arteriogram to Duncan Fain that other reasonably competent physicians practicing in the same general neighborhood and in the same general line of practice ordinarily exercise in the same or similar circumstances."
There was no difference in the position of the plaintiffs and the defendants with respect to what the patient should be told regarding a pulmonary arteriogram. The issue on which they disagreed was whether the patient had, in fact, been advised of the risks involved and, if not, whether the failure to so advise him proximately caused his injuries. The causation issue is the primary point of difference between the parties on appeal.
Both sides agree that this issue is one of first impression in this state. However, many other states have considered the question and two lines of cases have developed. The majority has adopted the socalled objective standard, while a minority has adopted the so-called subjective standard. The plaintiffs urge us to adopt the minority subjective standard, by which causation is established solely by the testimony of the plaintiff that he would not have consented to the procedure had he been advised of the particular risk in question. Under this standard, proof of causation turns exclusively on the credibility of testimony of the patient. This view necessarily poses a purely hypothetical question, which is, as framed by Waltz & Scheuneman, Informed Consent to Therapy, 64 Nw.U.L. Rev. 628, 647 (1970): "Viewed from the point at which he had to decide, would the patient have decided differently had he known something he did not know?" Having posed the question in this way, the authors make the following observations:
"The answer, in the context of litigation, must be determined by the factfinder, whether or not the plaintiff's own testimony is accorded any weight. Because any answer to the hypothetical question 'What would the patient in fact have done?'can only be a guess, posing the causation issue in that form does not promote rational resolution of it. Additionally, plaintiff's testimony on the issue will be assessed primarily on the basis of its reasonableness in the view of the factfinder. Therefore, to provide a realistic framework for rational decision, the causation issue should be posed to the factfinder in terms of the effect of disclosure or nondisclosure of all material risks on a reasonable person in the plaintiff's *1153 position. While the plaintiff's testimony would be relevant, the proper question is whether a reasonable person in the plaintiff's position would have withheld consent ... had all material risks been disclosed."
Most courts which have considered the question, beginning with the United States Court of Appeals for the District of Columbia Circuit in the case of Canterbury v. Spence, 464 F.2d 772, 790-791 (D.C.Cir. 1972), have rejected the subjective test in favor of the objective standard. That particular court said:
"[W]hen causality is explored at a postinjury trial with a professedly uninformed patient, the question whether he actually would have turned the treatment down if he had known the risks is purely hypothetical: `Viewed from the point at which he had to decide, would the patient have decided differently had he known something he did not know?' And the answer which the patient supplies hardly represents more than a guess, perhaps tinged by the circumstance that the uncommunicated hazard has in fact materialized.
"In our view, this method of dealing with the issue of causation comes in second best. It places the physician in jeopardy of the patient's hindsight and bitterness. It places the factfinder in the position of deciding whether a speculative answer to a hypothetical question is to be credited. It calls for a subjective determination solely on testimony of a patientwitness shadowed by the occurrence of the undisclosed risk.
"Better it is, we believe, to resolve the causality issue on an objective basis: in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance. If adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm, causation is shown, but otherwise not. The patient's testimony is relevant on that score of course but it would not threaten to dominate the findings. And since that testimony would probably be appraised congruently with the factfinder's belief in its reasonableness, the case for a wholly objective standard for passing on causation is strengthened. Such a standard would in any event ease the fact-finding process and better assure the truth as its product."
In Woolley v. Henderson, 418 A.2d 1123, 1132 (Me.1980), the Supreme Court of Maine rejected the subjective standard, stating:
"We believe that the subjective test is an unsatisfactory gauge for determining causality in informed consent actions and, therefore, in accord with those courts that have squarely addressed this issue, we hold that causation should be judged by an objective standard. E.g., Canterbury v. Spence, supra, 464 F.2d at 790-91; Cobbs v. Grant, supra, 8 Cal.3d [229] at 245, 502 P.2d [1] at 11-12, 104 Cal.Rptr. [505] at 515-16 [1972]; Hamilton v. Hardy, 37 Colo.App. 375, 381, 549 P.2d 1099, 1105 (1976); Funke v. Fieldman, 212 Kan. 524, 535-38, 512 P.2d 539, 549-50 (1973); Sard v. Hardy, supra, 281 Md. [432] at 447-50, 379 A.2d [1014] at 1024-25 [1977]; Scaria v. St. Paul Fire & Marine Ins. Co., 68 Wis.2d 1, 13-16, 227 N.W.2d 647, 654-55 (1975); see, Aiken v. Clary, supra, 396 S.W.2d [668] at 676 [1965]."
The Maryland Court of Appeals in Sard v. Hardy, 281 Md. 432, 379 A.2d 1014 (1977), adopted the objective standard and rationalized its rejection of the subjective standard thusly:
"[I]f a subjective standard were applied, the testimony of the plaintiff as to what he would have hypothetically done would be the controlling consideration. Thus, proof of causation under a subjective standard would ultimately turn on the credibility of the hindsight of a person seeking recovery after he had experienced a most undesirable result.... Such a test puts the physician in `jeopardy of the patient's hindsight and bitterness.' *1154 Canterbury v. Spence, 464 F.2d at 790-791. Furthermore, in cases where the plaintiff dies as a result of an unforewarned collateral consequence, the subjective standard would bar recovery on an informed consent claim altogether. Bowers v. Garfield, 382 F.Supp. 503, 506 (E.D.Pa.), aff'd mem., 503 F.2d 1398 (3rd Cir.1974)."
379 A.2d at 1025.
Plaintiffs contend in brief that the objective standard does away with consideration by the jury of the patient's testimony concerning his thoughts. This is not true. As the defendants point out in brief, under the objective view, the patient's testimony occupies the same place in the jury's deliberative process that the testimony of a defendant charged with assault with intent to kill occupies when that defendant testifies that he did not intend to kill the other party. It is pertinent testimony, but not conclusive of the issue. The jury takes that testimony into consideration along with other facts in determining whether the testimony is to be believed. As stated by the Maryland Court of Appeals in Sard v. Hardy, supra, when adopting the objective standard:
"Under this rule, the patient's hindsight testimony as to what he would have hypothetically done, though relevant, is not determinative of the issue."
379 A.2d at 1025.
The majority, in the better reasoned cases, adheres to the objective standard.
"There must be a causal relationship between the physician's failure to inform and injury to the plaintiff. Such causal connection arises only if it is established that had revelation been made consent to treatment would not have been given.... (Shetter v. Rochelle (1965) 2 Ariz.App. 358, 409 P.2d 74; Sharpe v. Pugh (1967) 270 N.C. 598, 155 S.E.2d 108; cf. Aiken v. Clary (Mo.1965) supra, 396 S.W.2d 668).
"The patient-plaintiff may testify on this subject but the issue extends beyond his credibility. Since at the time of trial the uncommunicated hazard has materialized, it would be surprising if the patient-plaintiff did not claim that had he been informed of the dangers he would have declined treatment. Subjectively he may believe so, with the 20/20 vision of hindsight, but we doubt that justice will be served by placing the physician in jeopardy of the patient's bitterness and disillusionment. Thus an objective test is preferable: i.e., what would a prudent person in the patient's position have decided if adequately informed of all significant perils."
Cobbs v. Grant, 8 Cal.3d 229, 104 Cal.Rptr. 505, 515-516, 502 P.2d 1, 11-12 (1972). See, also, Miller v. Kennedy, 11 Wash.App. 272, 522 P.2d 852 (1974); Cunningham v. United States, 683 F.2d 847 (4th Cir.1982); Archer v. Galbraith, 18 Wash.App. 369, 567 P.2d 1155 (1977); Dries v. Gregor, 72 A.D.2d 231, 424 N.Y.S.2d 561 (1980); Todd v. United States, 570 F.Supp. 670 (D.S.C. 1983); Hartke v. McKelway, 707 F.2d 1544 (D.C.Cir.1983).
We agree that the objective standard is fairer to both plaintiff and defendant.
Commentators who have studied the law of informed consent agree that the objective standard is the preferable test of causation in informed consent cases. For example:
"As with the standards for disclosure, there are different approaches to the criterion for causality. One point of view emphasizes the unfairness to practitioners involved in gauging what might have happened by what patients say they would have done had the risk information been disclosed. The patient-plaintiffs are thus placed in a unique position and allowed to state in court that, after all is said and done, in retrospect they would not have agreed to treatment. Patients cannot divorce their re-created decision process from hindsight. The same difficulty will trouble triers of fact. No one can be really certain that a patient would have withheld consent at the time if he or she had known the undisclosed facts. Moreover, if the patient should die as a result of the procedure, reliance upon such a test of causality as this *1155 would probably preclude recovery altogether. Some courts, nonetheless, recognize such a causality standard.
"The great preponderance of jurisdictions follows the `reasonable person' standard of causality, which is perceived as a much more fair standard to both plaintiffs and defendants. This standard is based on what a reasonable person in the patient's position would have done had risk information been disclosed. What a reasonable person would agree to depends in large measure on the facts and surrounding circumstances of an individual case. The standard reflects the view that obtaining consent must be accomplished on a case-by-case basis, taking into account the peculiar needs and concerns of each patient."
F. Rozovsky, Consent to Treatment, 62-63 (§ 1.13.4, "Causation in Negligent Consent") (1984).
Likewise, in their treatise on medical malpractice, two legal experts in this field have advocated the adoption of the objective standard:
"Two schools of judicial thinking have emerged regarding the appropriate test for measuring causal connection in the context of an informed consent case. The `subjective test' inquires as to what the patient would have done in the face of adequate disclosure. The application of this test results in the question of causation turning on the `... credibility of the hindsight of a person seeking recovery after he had experienced a most undesirable result.' In addition thereto, there could be no recovery based upon an informed consent theory if the undisclosed risk resulted in the patient's death, for there could be no testimony of what the patient would have done if adequately informed. Thus, the subjective test is rather unsatisfactory and in fact not truly in step with negligence concepts where conduct is generally judged by reference to the `reasonable man.'"
1 S. Pegalis and H. Wachsman, American Law of Medical Malpractice, 103-104 (§ 2:15, "To Obtain an Informed Consent") (1980).
We note, however, that the objective standard requires consideration by the factfinder of what a reasonable person with all of the characteristics of the plaintiff, including his idiosyncrasies and religious beliefs, would have done under the same circumstances.
We also emphasize that by adopting this standard, we do not suggest that the plaintiff cannot testify as to what he would have done if full disclosure had been made. His testimony, albeit hindsight, is material and relevant and entitled to be considered by the jury. It simply is not conclusive of the causation issue.
We hold that the trial court properly charged the jury on the causation issue.
The plaintiffs finally argue that a certain remark by the trial court during its charge to the jury constitutes an impermissible comment on the evidence. This argument would, of course, be more persuasive if we had adopted the subjective test of causation advocated by the plaintiffs. Since we have, however, rejected the subjective standard in favor of the more generally accepted objective standard, we hold that the comment, when viewed in the light of the court's entire charge, was not inconsistent with substantial justice. Rule 61, A.R. Civ.P.
The plaintiffs complain of the court's use of the phrase "hindsight and self-serving." Of course, the testimony was hindsight, and it was self-serving. The court correctly allowed it nonetheless. We agree that the comment was necessary to explain to the jury that this testimony alone could not constitute conclusive proof of causation. The entire charge on causation follows:
"Now a question that probably will arise in your deliberations on this element [proximate causation] is this: How can plaintiffs prove that a sufficient disclosure of the risks attendant to a pulmonary arteriogram, under all of the circumstances of this case, would have resulted *1156 in a decision to refuse to submit to the procedure? How can they prove that? In answer to that question, let me first tell you that plaintiffs cannot prove this element simply by the testimony of Duncan Fain. You will recall that during the direct examination of Mr. Fain, I permitted him, over objection, to testify that if he had known that the performance of a pulmonary arteriogram entailed risk of damaging his heart or causing death, then, he would not have consented to the procedure. I allowed him to testify to that point, because his answer is relevant on this issue of proximate cause. Mr. Fain's testimony in that regard is evidence which you may take into account in arriving at a decision on the issue of proximate cause, but it is not determinative of the issue. Mr. Fain's testimony cannot, standing alone, prove this element of plaintiffs' negligence claim. His testimony to that effect is hindsight and self-serving. So, you cannot base your decision on the issue of proximate cause on the basis of that testimony alone. Rather, you must decide what a reasonably prudent person, in the position of Duncan Fain, would have decided if he had been sufficiently informed of the risks attendant to a pulmonary arteriogram. Now, let me repeat that for you. You must decide what a reasonably prudent person, in the position of Duncan Fain, would have decided if he had been sufficiently informed of the risks attendant to the performance of a pulmonary arteriogram. Consequently, if after a full and fair consideration of all the evidence, you decide that disclosure of all material risks would not have changed the decision of a reasonable person, in the position of Duncan Fain, then, there is no proximate causal connection or relation between non-disclosure or insufficient disclosure and the alleged injuries, and therefore, plaintiffs' claim of negligence would fail. Such a finding would end your deliberations on the negligence claim. On the other hand, if you are reasonably satisfied from the evidence that disclosure of all material risks would have caused a reasonable and prudent person, in the position of Duncan Fain, to refuse to submit to the pulmonary arteriogram, then, the proximate cause element of plaintiffs' negligence claim has been established and you would then proceed to the fourth element of the claim, the consideration of damages."
We find no reversible error. The trial court properly charged the jury on the applicable law. A fact issue was presented on two issues: Did the defendants adequately inform the patient of the material risks involved and, if not, did the patient's uninformed consent cause his injury? By its verdict in favor of the defendants, the jury has resolved one or both of these against the plaintiffs.
The judgment of the trial court is affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, SHORES and BEATTY, JJ., concur.
ALMON, J., concurs in the result.
FAULKNER, JONES and ADAMS, JJ., dissent.
JONES, Justice (dissenting):
I respectfully dissent. In the name of "fairness," the majority opinion, at the very least, substantially compromises the fundamental right of self-determination.
More often than not, when the respective members of this Court differ as to the appropriate result in a given case before us for decision, that difference is grounded on a common premise. That, unfortunately, is not the case here. Our disagreement stems from a different understanding of basic, traditional tort concepts. The majority's holding diverts the focus of the jury's determination of causation away from the patient, who, as a competent adult, is vested with the exclusive right to give or withhold informed consent to a proposed medical procedure. Instead, the opinion redirects the focus of the jury's determination upon the hypothetical "reasonable person" *1157 to test whether the breach of duty by defendant doctors proximately caused this patient's injuries.
I would address the issues here presented thusly:
This appeal presents an issue of first impression in Alabama: In a medical malpractice failure-to-inform action, is the proximate cause element determined by a "reasonable person" standard or by a "patient's perspective" standard?
As in all tort actions for damages, an element of Plaintiffs' prima facie case is proximate cause.[1] In some jurisdictions, a plaintiff satisfies this proximate cause element simply by proving that but for the doctor's failure to inform him of the risks, he would not have been injured, because he would not have consented to the operation or procedure. See, e.g., Scott v. Bradford, 606 P.2d 554 (Okla.1980). For the sake of brevity, I refer to this test as the "patient's perspective" standard.
Other jurisdictions, however, adhere to the "reasonable person" proximate cause standard. In these jurisdictions, to satisfy this element of his claim, a plaintiff must prove that, but for the doctor's failure to inform him of the risks, a reasonably prudent person similarly situated would not have consented to the operation, and thus would not have been injured.[2] See, e.g., Canterbury v. Spence, 464 F.2d 772 (D.C. Cir.1972).
In the instant case, Plaintiffs argue that proximate causation should be tested under the "patient's perspective" standard. Defendants argue that the proper test is the "reasonable person" standard. In my opinion, the Court's analysis of this "first impression" issue should begin with an examination of the reasons behind Alabama's recognition of a failure-to-inform medical malpractice action.
Having existed for only a quarter of a century or so (C. Lidz, A. Meisel, E. Zerubavel, M. Carter, R. Sestak, and L. Roth, Informed Consent: A Study of Decisionmaking in Psychiatry 10 (1984)), the doctrine of "informed consent" is a relatively new development in the law. In its simplest form, the "informed consent" doctrine requires a doctor to inform his patient of the risks attendant to his performance of a procedure or operation upon that patient. Because of the "informed consent" doctrine, a patient's bare signature on a consent form may no longer protect a doctor from liability. Even though a patient signs a consent form, if his doctor (or the form) does not inform the patient of the risks of a *1158 procedure or operation, the doctor, nonetheless, may be liable for failure to inform.
Thus, through the common law process, a new cause of action evolved to compensate patients injured as a result of the breach of this duty and to encourage doctors to inform their patients of the risks attendant to a proposed procedure or operation. Essentially, the newly created remedy found its rationale in man's inherent right of self-determination as a "fundamental tenet of English and American common law." Capron, Informed Consent in Catastrophic Disease Research and Treatment, 123 U.Pa.L.Rev. 340, 346 (1974).
Judge Cardozo, in simple, eloquent language, explained in Schloendorff v. Society of New York Hospital, 211 N.Y. 125, 129, 105 N.E. 92, 93 (1914):
"Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages."
Judge Cardozo's statement was made in an assault and battery context in which no consent at all was obtained. See, also, Donald v. Swann, 24 Ala.App. 463, 137 So. 178 (1931), cert. denied, 223 Ala. 493, 137 So. 181 (1931). His statement was still applicable some forty years later, however, when courts began to realize that requiring consent in its barest form did not fully protect this human right of self-determination.[3] The patient is not truly afforded this fundamental right when he consents to a procedure without being informed of its risks or alternatives. Hence, the birth of the informed consent doctrine and its corresponding failure-to-inform remedy.
With this background in mind, the precise question before us may be rephrased: Which of the two recognized proximate cause standards in a failure-to-inform action best complements, protects, and ensures the patient's right of self-determinationthe very reason behind the judicial recognition of this cause of action? It seems clear to me that we need only answer one further question before a choice between the two standards becomes clear: Is it the aim of the law to protect only the reasonable patient's right of self-determination? The obvious answer is "Of course not." The right of self-determination, the "inviolability of ... [one's] person, ... his right to himself," (Pratt v. Davis 118 Ill. App. 161, 166 (1905), aff'd, 224 Ill. 300, 79 N.E. 562 (1906)), is a right not reserved for reasonable persons alone.
In so answering, I join the majority of many commentators who have answered similarly:
"The whole point of the inquiry, and the potential liability, is to safeguard the right of individual choice, even where it may appear idiosyncratic." Katz, Informed ConsentA Fairy Tale? Law's Vision, 39 U.Pitt.L.Rev. 137, 163 (1977).
"The right of a person to protect or disregard the health of his body is a basic right of bodily freedom and individual choice." Comment, Informed Consent after CobbsHas the Patient Been Forgotten? 10 San Diego L.Rev. 913, 925 (1973) (hereinafter cited as Comment, Informed Consent).
"The patient owes no one a duty to decide prudently." Capron, supra, at 410.
To adopt the "reasonable person" standard would be to "deny the patient-subject with special `fears and hopes,' or the religious beliefs of a Jehovah's Witness, the right to make a decision." Id. at 420. Furthermore, its application bars "recovery by a patient whose idiosyncratic decision making takes him outside the realm of the *1159 `reasonably prudent person.' This is equivalent to a defense of contributory negligence, which has no place in an action for failure to obtain informed consent." Id. at 410.
Therefore, I would hold that the proper proximate cause standard in an Alabama failure-to-inform action is the "patient's perspective" standardwhat would this patient have decided if he had been adequately informed?
My resolve that the "patient's perspective" standard is the proper causation standard for this State is strengthened by the result of the hypothetical "flip-side" of the present situation. Suppose that, as in the present case, Mr. Fain underwent a pulmonary arteriogram and his heart was punctured. At trial, however, Mr. Fain concedes that he gave informed consent to the doctors for the performance of the procedure. But he then argues that the consent was invalid because the "reasonable person" would not have consented. In other words, he says he knew all the risks, he was informed, and he consented, but he was unreasonable in consenting; and, therefore, the doctors should be liable for proceeding with the arteriogram and injuring him.
Such an argument, of course, is absurd. It is axiomatic that, absent actionable negligence in the performance of the procedure, "[o]nce obtained in a proper manner, informed consent is tantamount to the patient thereafter `assuming the risks' inherent in the care or treatment consented to by him.... `Having been effectively informed, the patient himself assumes the risks of treatment ... this being the legal doctrine of "assumption of risk."'" F. Camps, Gradwohl's Legal Medicine 425 (3d ed. 1976) (quoting E. Rose, Law in Medical Practice: Sourcebook in Medical Jurisprudence (1971)). Logically, if the law allows patients to be unreasonable when they give consent, the law should allow them to be unreasonable when they withhold consent. As discussed below, I have heard no arguments so compelling as to persuade me to depart from the logic of consistent "flip-side" results and adopt the "reasonable person" standard.
In addition to denying some patients their right of self-determination and being inconsistent with the "flip-side" situation, in the context of the informed consent causation issue, the "reasonable person" standard becomes rather nebulous. Reasonable people can and do differ in the highly individual context of personal health care. In recognition of this fact, one commentator has stated:
"The belief that there is one `reasonable' or `prudent' response to every situation inviting medical intervention is nonsense, both from the point of view of the physician as well as that of the patient. Since different doctors approach similar cases in diametrically opposed ways, equally varying responses by patients ought to be considered `reasonable.'" Katz, supra, at 163.
That writer added:
"[D]octors place a high value on physical longevity. Law, and eventually medicine too, ought to contenance a wide range of potentially reasonable responses by a patient to his medical condition based on other value preferences. Physical longevity is not the only touchstone of prudence. That prudent men will choose different courses of treatment, depending on their personal values, undercuts the court's notion that one `reasonable' choice exists against which the plaintiff's conduct is to be measured." Id. at n. 84.
The "reasonable person" standard for testing causation, in this context, then, is no longer a standard of "objectivity"the quality so highly praised by its proponents. Instead, it becomes a "subjective" standardnot one "subjective" standard as in the case of the "patient's perspective" standard, but a subjective standard as to each and every juror (at which point, of course, it is no longer a "standard" at all). If there is no one reasonable person, each juror is left with subjectively determining what he or she would have done (e.g., "Well, I'm reasonable, so what would I have done in this situation?").
*1160 In arriving at my decision, I am not unaware of, and have not ignored, the arguments in favor of the "reasonable person" standard. Defendants and others opposing the "patient's perspective" standard most vigorously argue that its adoption allows the jury to consider a plaintiff's testimony that is colored by bitterness and transformed by hindsight. Canterbury states that the "patient's perspective" standard "places the physician in jeopardy of the patient's hindsight and bitterness." Canterbury v. Spence, supra, at 790.
Certainly, human nature is such that only the rare patient, if not the nonexistent patient, can truly rise above bitterness and place himself backwards in time, imagine that he had been informed, and ask himself what he would have done, without considering the already-known result. I acknowledge this, and yet I do not agree that it places the defendant doctor in any sort of "jeopardy." To accept such an argument against adoption of the "patient's perspective" standard is to accept implicitly the idea that juries are devoid of any understanding of human nature. Juries are not so ignorant.
As one commentator has noted, "Questions of the influence of hindsight and bitterness are familiar to juries, as is the problem of self-serving testimony generally." Katz, supra, at 164. Other commentators have also refused to accept the idea that juries cannot adequately recognize and adjust for bitter testimony based on hindsight:
"Surely the jury will recognize the apparent self-interest underlying that testimony of the plaintiff. And, just as surely, counsel for the defendant, in summation, will underscore that self-interest as a critical factor to be considered by the jury in determining the credibility to be extended the plaintiff and the weight to be given his testimony. In all likelihood, that portion of defendant's summation will be contemplated by an instruction from the court to the jury to take self-interest into account in determining matters of credibility and weight. Moreover, the jury is likely to realize that, self-interest aside, the plaintiff may find it difficult to know factually whether or not he would have consented, given an adequate disclosure, before suffering the ultimate adverse consequences." Seidelson, Medical Malpractice: Informed Consent Cases in "Full-Disclosure" Jurisdictions, 14 Duq.L.Rev. 309, 330-31 (1976).
"The danger that a physician-defendant will be unfairly prejudiced by the patientplaintiff's testimony is slight. It can be minimized through cross-examination and through defense counsel's perfectly legitimate suggestion in argument to the jury that the patient's statements be received with suspicion if they deviate too greatly from common experience without adequate explanation." Capron, supra, at 420.
"How the patient testifies in light of the injuries he has suffered should be a function of his credibility as a witness, not a basis for adopting a new judicial standard. The ... fear that the jury would not be able to rationally determine causation based on the testimony of a `bitter and disillusioned' plaintiff could be laid to rest with a properly constructed jury instruction. Such an instruction would direct the jury to take into consideration the plaintiff's possible `bitterness and disillusionment' in evaluating his testimony. Such factors as the ramifications a refusal to have consented to treatment would have had on the patient's future health, and the nature of the illness itself could be included in such an instruction and thus guarantee a sound determination of the plaintiff's credibility." Comment, Informed Consent, supra, at 926.
Thus, because I believe that a jury can recognize and adjust for self-interest, hindsight, and bitterness in a plaintiff's testimony, I cannot find any undue prejudice to a defendant doctor in allowing the jury to consider such testimony as part of the "patient's perspective" standard.
Furthermore, I would point out that the "reasonable person" standard does not *1161 keep a plaintiff's self-serving, bitter testimony colored by hindsight from the jury. On the contrary, even under the "reasonable person" standard, before plaintiff may recover the jury must still consider and believe plaintiff's testimony to the effect that he would have declined the procedure if he had been informed.[4] As explained by one commentator:
"Whether a subjective or an objective standard is utilized, plaintiff's case will fail if plaintiff concedes that, given an adequate disclosure, he would have consented.... [E]ven given the objective standard, a sine qua non to a legally sufficient plaintiff's case is evidence that the particular patient would not have consented. In reality, the objective standard requires evidence from the plaintiff which would justify affirmative determinations that neither the particular patient nor a reasonable person in like circumstances would have consented.... [J]ury acceptance of plaintiff's testimony that, given an appropriate disclosure, he would have withheld consent is a legal requirement for a verdict for the plaintiff, whichever standard is employed." Seidelson, supra, at 330-31.
Moreover, any causation determination arises only in the context of the doctor's culpability. That is to say, only after the factfinder decides the "breach of duty" element against the doctor is the test for proximate cause invoked. The Oklahoma Supreme Court in Scott v. Bradford, supra, at 559, said it this way:
"Although it might be said this approach places a physician at the mercy of a patient's hindsight, a careful practitioner can always protect himself by insuring that he had adequately informed each patient he treats. If he does not breach this duty, a causation problem will not arise."
Another argument Defendants advance against the "patient's perspective" standard is that it precludes recovery in the case of a dead patient. Specifically, they argue that, if a "patient's perspective" standard is used, the patient who dies during an unconsented-to operation (i.e., "unconsented to" in the sense of lack of informed consent) will be unable to recover for the failure to inform, because, obviously, he cannot testify at trial that he would have declined the operation if he had been informed of the risks. Indeed, "it would be unjust to bar recovery when the harm caused by a possibly unconsented-to medical procedure was so great as to prevent the injured party from testifying, just as defendants who killed their victims, before Lord Campbell's Act, were less in jeopardy than those whose conduct had not been fatal." Capron, supra, at 419 n. 194.
But I do not agree with Defendants that the "patient's perspective" standard would bar such a plaintiff from recovering. Juries make inferences every day from proffered evidence in contexts other than medical malpractice causation. Certainly, juries are capable of inferring from all the surrounding facts and circumstances that the plaintiff who does not or cannot testify because of death, disability, or inadvertence would not have consented to the operation if informed.
Other courts have held that lack of direct evidence to the effect that plaintiff would have declined the operation does not preclude his recovering for failure to inform under the "patient's perspective" standard:
"On the other hand, a jury could find from all the facts and circumstances in a particular case that had plaintiff been properly informed he would not have consented to the treatment, and this is so even though plaintiff does not specifically so testify."[5]Aiken v. Clary, 396 S.W.2d 668, 676 (Mo.1965).

*1162 "[A]nd it may be reasonably inferred from plaintiff's allegations that, if the facts concerning Chloromycetin are as alleged by plaintiff, Brenda's parents would not have consented to or permitted the use of Chloromycetin in defendant's treatment of her." Sharpe v. Pugh, 270 N.C. 598, 155 S.E.2d 108, 113 (1967) (North Carolina Supreme Court's reversal of the granting of a motion to strike). "While the appellant did not directly testify that she would have refused to take the proposed cobalt irradiation treatments had she been properly informed, we think the evidence presented by the record taken as a whole is sufficient and would authorize a jury to infer that had she been properly informed, the appellant would not have taken the cobalt irradiation treatments." Natanson v. Kline, supra, 187 Kan. 186, 191, 354 P.2d 670, 673-74 (opinion denying rehearing) (1960).
I agree with these courts that juries are perfectly capable of finding that the evidence does or does not support an inference that the plaintiff would have withheld consent if properly informed. Thus, the "patient's perspective" standard does not operate to unjustly deny the right to recovery on behalf of the dead or incompetent patient.
Defendants also argue that, because the "reasonable person" standard is the majority rule, we, too, should adopt this standard. The "reasonable person" standard originated in Canterbury v. Spence, supra,[6] citing as its sole authority a Northwestern University Law Review article by Professors Waltz and Scheuneman. Waltz and Scheuneman, supra; Canterbury, supra, at 790-91 & nn. 107-110. See Capron, supra, at 419 n. 194. Although, to be sure, the majority of courts that have addressed this issue have adopted the Waltz-Scheuneman/Canterbury "reasonable person" standard, that article, that holding, and that standard have received considerable criticism. See, generally, Capron, supra; Katz, supra; Seidelson, supra; and Comment, Informed Consent, supra.
I agree with the Oklahoma Supreme Court in Scott v. Bradford, supra, at 559:
"Although the Canterbury rule is probably that of the majority, its `reasonable man' approach has been criticized by some commentators as backtracking on its own theory of self-determination. The Canterbury view certainly severely limits the protection granted an injured patient. To the extent the plaintiff, given an adequate disclosure, would have declined the proposed treatment, and the reasonable person in similar circumstances would have consented, a patient's right of self-determination is irrevocably lost. This basic right to know and decide is the reason for the full-disclosure rule. Accordingly, we decline to jeopardize this right by the imposition of the `reasonable man' standard."
While my primary emphasis in rejecting the "reasonable person" rule for testing causation has been placed on every person's right of self-determination, there is yet another equally valid reason for so deciding this issue. Traditional tort law, evolving over several centuries through the common law process and statutory enactments, relegates the application of the "reasonable person" standard exclusively to the breach of duty determination. It has no field of operation in measuring the *1163 requisite nexus between the defendant's breach of duty and the cause of the claimant's injuries.
Indeed, this distinction is maintained in Alabama's Medical Malpractice Act. Code 1975, § 6-5-484(a), prescribes the defendant doctor's standard of duty and its breach in terms of an objective standard, measured by the conduct of other reasonable and diligent doctors "in the same general neighborhood, and in the same general line of practice." By its silence, the Act leaves the causation element to existing common law. While the causation rule inherently embraces "reasonableness" as one of the factfinder's considerations in testing witness credibility, it acknowledges no reference to the "reasonable person" standard. Thus, in the instant circumstances, I find no compelling basis for radically altering the time-honored tort concept of causation.[7]
Yielding to this Court's holding with respect to the causation issue, I agree that we should adopt the totality of the trial judge's comments on its application as a model jury instruction. Indeed, his factual conclusion that Plaintiff's testimony was self-serving and hindsight is an essential premise for the balance of his charge. But this only exacerbates the problem. It is beyond debate that the trial judge's "hindsight and self-serving" instruction is violative of the rule that sharply divides the trial court's legal prerogative and the jury's factfinding prerogative. While, in judging witness credibility, the jury is free to take into account, as it deems appropriate, the plaintiff's self-interest or bias (together with all other probative circumstances), if it so finds, it is entirely inappropriate for such a finding to be made for the jury by the court.
This analysis, then, focuses on another essential difference between the two causation standards. Under the "reasonable person" test, the jury is instructed, as a matter of law, on the lack of credibility of the patient's testimony that, if informed of the risks, he would have rejected the treatment. Under the "patient's perspective" standard, witness credibility is left to the exclusive province of the jury, where, as a factual issue, it traditionally and rightfully belongs.
Before concluding, I would make one further comment addressed to the majority opinion. I quote directly therefrom:
"We note, however, that the objective standard requires consideration by the factfinder of what a reasonable person with all of the characteristics of the plaintiff, including his idiosyncrasies and religious beliefs, would have done under the same circumstances."
On its face, it would seem that this expression of the applicable causation standard, though perhaps the essential concept is somewhat differently articulated, closes the gap between the majority and my dissenting views on this dispositive issue.
To be sure, if the jury's determination is to be guided by what the reasonable person, "with all of the characteristics of the plaintiff, including his idiosyncrasies and religious beliefs," would have decided "under the same circumstances," if informed of the risk, does not this eliminate the substantive quarrel between us? Is it not the primary thrust of my dissent that it is this patient's individual choice, founded on his own peculiarities, on which the jury must ground its findings? If the majority is willing to include these factors regarding the patient's individual right of choice into the "objective" reasonable person standard, and if my view would permit evidence of what the reasonable person, under these circumstances would do, as going to the issue of witness credibility, have we not arrived at the same conclusion, though by different conceptual routes?
*1164 Not only am I willing to accept an affirmative reply to each of these questions, but I would abandon my approach and adopt the rationale of the majority, except for the final order of the majority opinion affirming the trial court's judgment. That is to say, the trial court's jury instruction did not build into its "reasonable person" standard "all of the characteristics of the plaintiff"the standard adopted by the majority. Not even the Appellees contend that the trial judge's reference to "in the position of Duncan Fain" was intended as anything more than a shorthand version of the trial court's earlier reference to "under all the circumstances of this case."
It seems perfectly clear, and Appellees do not contend otherwise, that the jury was instructed that, while it could take into account Plaintiff's testimony, it was to determine what a reasonable person, in like circumstances, would have decided if sufficiently informed of the attendant risk. This instruction, it seems to me, falls materially short of the standard articulated by the majority opinion, prescribing "what a reasonable person with all of the characteristics of the plaintiff, including his idiosyncrasies and religious beliefs, would have done under the same circumstances."
In conclusion, I quote Professor Katz ("Informed ConsentA Fairy Tale? Law's Vision," supra.):
"If the grand rhetoric of self-determination is to be given any meaning at all, framing the question in terms of the decision of a reasonable person grossly and unnecessarily substitutes judicial paternalism at precisely the wrong point."
For the reasons stated, I would reverse the judgment and remand the cause for a new trial.
ADAMS, Justice (dissenting).
I respectfully dissent. I have no quarrel with the standard enunciated by the majority, but we should call it what it isthe patient perspective or subjective standard, not the reasonable person objective standard. When we build into the standard, as we have done here, "all of the characteristics of the plaintiff, including his idiosyncrasies and religious beliefs," we no longer have the reasonable person standard. Viewing the trial judge's charge as a whole, we are compelled to conclude that he did not charge in this vein, otherwise he would not have told the jury to view plaintiff's testimony as self-serving and hindsight. Therefore, since the standard used by the trial judge is different from the standard we adopt here, the judgment below should be reversed and the cause remanded for a retrial under the proper standard.
After oral argument I was convinced that the patient perspective or subjective standard was unfair to the medical profession and, indeed, unworkable in a court of law, taking into consideration the unique position of the plaintiff. However, given the considerations underlying the doctrine of informed consent, no other standard makes sense. The plaintiff's testimony, however, should not be conclusive and should be tested by testimony offered by the doctor as to what a reasonable patient under the same or similar circumstances would have done.
NOTES
[1] Because the acceptance by Appellees/Defendants of the "Statement of the Issue Presented" by Appellants/Plaintiffs could be construed as conceding breach of their respective duties to obtain Plaintiffs' informed consent, a note of explanation may be helpful. To be sure, each of the defendants vigorously contradicts Plaintiffs' claim that they did not inform Mr. Fain of the risks of the arteriogram. This factual issue was properly submitted to the jury. The trial court correctly instructed the jury that, if it found the breach of duty issue favorably to Plaintiffs, then it should consider the element of causation. No request for special findings were submitted, and the jury returned a general verdict for Defendants.

Therefore, the propriety of the trial court's causation instruction (i.e., the "reasonable person" standard) must be tested in the context of a factual finding adverse to Defendants on the breach of duty issue. Stated differently, this Court's analysis proceeds on the assumption that Defendants failed to inform Plaintiffs of the risks attendant to the performance of a pulmonary arteriogram.
[2] Although other cases and legal scholars dealing with this problem denominate these opposing standards as "objective" and "subjective," I find these terms more confusing than helpful. Indeed, to refer to the "patient's perspective" standard as "subjective" is, of itself, an editorial comment disfavoring its application. In the same vein, reference to the "reasonable person" standard as "objective" carries its own inference of acceptance. In fact, when testing causation, as opposed to breach of dutythe context within which tort law traditionally employs the "reasonable person" rulehardly anything could be more subjective than determining what a reasonably prudent person, similarly situated, would have done. Moreover, the objectivity of the "reasonable person" standard applicable to a breach-of-duty determination loses its character when transposed to the subsequent causation determination and has the practical effect of inviting the jury to re-examine its breach-of-duty finding.
[3] See, e.g., Natanson v. Kline, 186 Kan. 393, 350 P.2d 1093, opinion denying rehearing, 187 Kan. 186, 354 P.2d 670 (1960), an informed consent case in which Judge Cardozo's statement is echoed:

"Anglo-American law starts with the premise of thorough-going self determination. It follows that each man is considered to be master of his own body, and he may, if he be of sound mind, expressly prohibit the performance of life-saving surgery, or other medical treatment." 186 Kan. at 406-07, 350 P.2d at 1104.
[4] See F. Rozovsky, Consent to Treatment: A Practical Guide 64 (1984): "[E]ven in those states that follow the reasonable patient standard, evidence of what the individual patient would have done had he or she known the undisclosed facts may be important."
[5] Two commentators have interpreted the Aiken v. Clary decision as adopting a "reasonable person" standard. Waltz and Scheuneman, Informed Consent to Therapy, 64 Nw.U.L.Rev. 628, 647 n. 74 (1970). They apparently based their conclusion on the Aiken court's statement that "if the evidence was that the plaintiff was about to die and chances for survival were one out of ten, a jury might well conclude that a more complete disclosure of the hazards involved in an operation would have made no difference to plaintiff in deciding whether to consent to an operation which, if successful, would make his survival reasonably likely." Aiken, supra, at 676.

Others, however, have disagreed with this interpretation. See Capron, supra, at 419-20 n. 194 ("The Aiken court said nothing ... to indicate that in the ordinary case the jury ought not look to the plaintiff's own decisionmaking in assessing causation").
[6] See Comment, Informed Consent, supra, at 925: "Never before Canterbury had it been suggested that the patient can only refuse treatment if the reasonable, prudent man would have done likewise."
[7] To be sure, this does not mean, as the majority assumes, that a defendant is barred from showing what a reasonable person would or would not do under similar circumstances, so long as such evidence bears solely on the issue of witness credibility and not on the ultimate issue of what someone other than the patient would have done. It is the rejection of the patient's exclusive right to decide that constitutes our essential difference.