Jeanne L. SHULTZ, Plaintiff/Appellant,

v.

Bernard RICE, M.D.,
Defendant/Appellee.

No. 84–2068.

United States Court of Appeals,
Tenth Circuit.

Dec. 19, 1986.

644

Leland F. Dempsey, Kansas City, Mo. (William H. Pickett, Kansas City, Mo. and Michael E. Callen, Callen, Sexton & Shelor, Kansas City, Kan. with him on brief), for plaintiff/appellant.

Frank Saunders, Jr., Wallace, Saunders, Austin, Brown and Enochs, Overland Park, Kan. (Michael P. Oliver with him on brief), for defendant/appellee.

Before McKAY, MOORE, Circuit Judges and SAM, District Judge.[*]

SAM, District Judge.

The plaintiff, Jeanne L. Shultz, appeals from a jury verdict in favor of the defendant, Dr. Bernard Rice, and from the district court's denial of her motion for new trial. Shultz seeks reversal of the denial and remand for a new trial on the ground the district court committed several errors. We hold no reversible errors were committed, and affirm.

I

Dr. Rice is a board certified doctor of internal medicine with a sub-specialty in

[*] Honorable David Sam, United States District Judge for the District of Utah, sitting by designation.

endocrinology.[1] On July 15, 1980, Dr. Rice first examined Shultz, age 25, for complaints of energy loss, weight gain, skin inflammation, and burning in her urinary tract. Shultz informed Dr. Rice of her medical history which included, in addition to skin inflammation, thyroid malfunction and long-term female problems involving surgical removal of an ovary when she was 17 and tentative diagnosis of multiple cysts on her remaining ovary.[2] Dr. Rice treated Shultz with ampicillin, an antibiotic used to combat various infections of the urinary tract, and asked her to return two days later. During the second visit, Dr. Rice gave Shultz an appetite suppressant and ordered a repeat urinalysis and a kidney x-ray.

On Friday, August 8, 1980, Shultz returned to Dr. Rice after he refused to prescribe medication over the telephone and he insisted she appear for examination. Shultz told him the burning in her urinary tract had ceased but she complained of nausea, swollen breasts, further weight gain, and absence of menstrual periods for two months. Although she had missed periods in the past, the two-month interval was the longest she had experienced. Dr. Rice testified at trial he asked Shultz, who was unmarried, whether she had engaged in sexual intercourse and he noted in his records she "denied exposure." Shultz maintains Dr. Rice never inquired concerning her sexual activity that occurred during the three months before her first visit.

Dr. Rice was aware of the previous diagnosis of multiple cysts on Shultz' ovary, and he ordered a battery of laboratory tests designed to discover the existence of ovarian cysts or other causes of her amenorrhea, the abnormal cessation of menstrual discharge. Among those ordered were a urine pregnancy test and a serum pregnancy test, the results of which are generally available a few hours after examination. Dr. Rice asked Shultz to return to his office following the testing, at which time he injected her with 200 milligrams of progesterone in sesame oil.[3] Progesterone in oil is a diagnostic agent that allows examination of the entire hypothalamic pituitary-thyroid axis, and injection of it has long been recommended as the initial stage in evaluation of an amenorrheic patient.

Later in the afternoon, after the injection, the lab reported the pregnancy test results were positive, and a sonogram conducted on Shultz the following Monday confirmed she was pregnant. Immediately following receipt of the sonogram results, Dr. Rice counseled Shultz in his office concerning the various options available to a pregnant single woman, including abortion. He testified he did not mention any alleged risk of fetal damage that could result from injection of a pregnant woman with progesterone in oil because he did not wish to alarm Shultz about what he considered a non-threatening situation.

Shultz claims that upon discovering she was pregnant, she became anxious about the possible effects upon her fetus of the appetite suppressant and progesterone in oil. She testified she asked the radiologist who administered the sonogram about the potential consequences of her progesterone in oil treatment, and he told her the injection was very dangerous to the fetus and should never have been given to her. Shultz stated she posed the same question to Planned Parenthood in Kansas City and the Pregnancy Hotline in Florida. The two groups allegedly agreed progesterone in oil should not be administered to pregnant women, and the hotline informed her the treatment could result in birth defects such

---

1. Dr. Rice's credentials list extensive research and publication, with emphasis on hormones. He is a fellow of the American College of Physicians, a Diplomate of the National Board of Medical Examiners, and a founding member of the Round Table of Endocrinology of Kansas City.

2. At trial, Shultz stated previous physicians told her she had a one-in-a-million chance of bearing a child.

3. Dr. Rice testified most textbooks of endocrinology, obstetrics, and gynecology recommend a dosage of between 100 and 200 milligrams of progesterone in oil as treatment for amenorrhea.

as limblessness, cleft palates, and masculinization of female fetuses. Shultz further testified that, on advice of counsel, she used the University of Missouri-Kansas City medline searches to obtain information concerning the effect of progesterone on fetuses. She also consulted with Dr. Joseph Manley, a physician who purportedly told her "it would be like shooting craps to keep the baby, because of the birth defects." [4] R. IX, 131.

On August 20, 1980, Shultz was hospitalized for abdominal pains and bleeding, problems unrelated to her progesterone in oil injection. Five days later, she was notified her fetus was no longer living.

Shultz brought this action seeking damages for the mental anguish caused her by Dr. Rice's medical negligence. The case was submitted to the jury on the following allegations of fault against Dr. Rice: 1) failure to ascertain whether pregnancy was the cause of Shultz' menstrual irregularity before injecting her with progesterone in oil; 2) failure to administer to Shultz the ordinary dose of progesterone in oil for treatment of amenorrhea; and 3) failure to inform Shultz of the risks progesterone in oil treatments pose for pregnant women.

Shultz made no claim for personal injury, nor did she claim the progesterone in oil injection caused any harm to her fetus. She claimed only Dr. Rice's actions caused her mental anguish during the two-week period from the confirmation to the termination of her pregnancy.

The jury returned a verdict for Dr. Rice. This appeal is taken from the jury verdict and the district court's denial of Shultz' motion for a new trial.

## II

On appeal, Shultz claims the district court erred by: 1) admitting evidence that Shultz was unmarried at the time of her pregnancy; 2) admitting evidence Shultz' expert witness, Dr. Bernard Nathanson, was director of the largest abortion clinic in the world; 3) permitting Dr. Rice's counsel to remark during closing argument that Shultz had offered no exhibits of medical literature regarding the controversial effects; 4) permitting Dr. Rice's counsel, during closing argument, to ask the jury to place themselves in the position of Dr. Rice on August 8, 1980; 5) permitting Dr. Rice's counsel to comment during closing argument on the failure of Dr. Manley to testify; 6) telling Shultz' counsel, in the presence of the jury, he was making strong accusations concerning Dr. Rice's alleged alterations of medical records; 7) failing to clarify its instructions after it received a note from the sequestered jury; 8) failing to use the verdict form for comparative negligence as recommended by the Kansas Pattern Instructions; 9) allowing Dr. Rice's counsel to cross-examine Dr. Rice with leading questions; 10) submitting Instruction No. 4 concerning comparative negligence to the jury; and 11) failing to grant a new trial.

## III

We note Shultz failed timely objection to preserve for appellate consideration her contentions 3, 5, 6, 7 and 8. Shultz' failure to raise these issues with the district court precludes their review except for the "most manifest error." *Gundy v. United States*, 728 F.2d 484, 488 (10th Cir.1984).[5] For reasons set out below, we find no manifest

**4.** No corroborative evidence of these alleged investigative communications and searches was introduced at trial.

**5.** *Neu v. Grant*, 548 F.2d 281, 285, 286 (10th Cir.1977), stated the following rationale for denying appellate review of issues not raised at the trial level:

It is fundamental that a party seeking reversal must establish that alleged trial errors were prejudicial. Matters not appearing in the record will not be considered by the court

of appeals. *McCullough Tool Co. v. Well Surveys, Inc.*, 343 F.2d 381 (10th Cir.1965), *cert. denied*, 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966). While exceptions to trial court rulings adverse to a party have been abolished, Fed.Rules Civ.Proc., Rule 46 requires that in lieu thereof, "it is sufficient that a party, at the time of the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and his grounds therefor; and, if a party has

**647**

error in the district court's actions related to the issues first raised on appeal.

## A. Remark by Dr. Rice's Counsel concerning Shultz' failure to produce the medical literature that allegedly created her emotional distress

Shultz asserts the district court erred by allowing Frank Saunders, Jr., counsel for Dr. Rice, to make the following portion of his closing argument:

> Now, on the same day, August 11, she contacted Mr. Pickett, and since that date, August 11, 1980, it is obvious this case has been orchestrated to the particular point today. She went to the medical library and by her testimony, she even showed emotion when she was telling it, she looked at all these pictures of deformed fetuses. On August 11 after Mr. Pickett suggested she go to a medical library and look up what she wanted to find out about progesterone in oil, but where are any of those articles? Where is any evidence in this case that any person other than maybe Planned Parenthood, maybe the Hotline from Florida, maybe Mr. Pickett, ever told her that Dr. Rice did anything wrong?

R. X, 84. Shultz argues the medical literature was inadmissible under Fed.R.Evid. 803(18), and Saunders' mention of its absence misled the jury by creating the impression the articles were being kept from them for improper reasons.

Dr. Rice responds the literature was crucial to the causation element in Shultz' claim for emotional distress. Therefore, her failure to produce it was relevant to the credibility of her testimony, on direct and cross-examination, that every article and medical text she read stated progesterone in oil is dangerous to a fetus.

We note Rule 803(18), an exception to the hearsay rule, allows admission of statements from learned treatises relied upon by an expert witness with the proviso that "[i]f admitted, the statements may be read into evidence but may not be received as evidence." Here, Dr. Rice's expert witness offered the only medical literature read into the record. Clearly, Shultz had the opportunity to read into the record the literature that allegedly caused her emotional distress, and the court's allowance of Saunders' comment on her failure to do so was not manifest error.

## B. Defense counsel's comment during closing argument regarding Dr. Manley's failure to testify

Dr. Joseph Manley is the gynecologist-obstetrician whom Shultz consulted concerning Dr. Rice's progesterone in oil treatment. Shultz read Dr. Manley's notes into the record but did not designate him as a witness.[6] In his closing argument, Saunders emphasized Dr. Manley's failure to testify, as follows:

no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice him." The purpose for timely objection or motion as a precedent to review on appeal is two-fold. It provides the trial court with the opportunity to know the specific contentions and to take corrective action, if required. And—more importantly for appellate review, it does not permit a party to sit idly by, watching error being committed, and then take a 'first' shot at the claimed error without having accorded the trial court the opportunity to correct its action. Such is not allowed. *Johnson v. United States,* 318 U.S. 189, 63 S.Ct. 549, 87 L.Ed. (1943); *Chavez v. New Mexico,* 456 F.2d 1072 (10th Cir.1972). Further, the objection must be so definite as to indicate to the trial court the precise ground upon which the evidence is inadmissible or the ruling objectionable. *Dow v. United States, for Use and Benefit*

*of Holley,* 154 F.2d 194 (10th Cir.1969); *Occidental Petroleum Corp. v. Walker,* 289 F.2d 1 (10th Cir.1961). The need for specific objection applies to rulings on evidence, formulation of issues for trial, arguments of counsel, submission of the case to the jury, instructing the jury and all other matters throughout the trial. Fed.Rules Civ.Proc., Rules 46 and 52, 28 U.S.C.A.; Federal Practice and Procedure, Barron and Holtzoff (Wright Ed. 2B, § 1021.)

6. Dr. Manley's notes stated:
   Jeanne Shultz, height five four-and-a-half; weight 135; blood pressure 102 over 68; date August 12, 1980. Last pap smear about one year ago. P/O Preg. test elsewhere. Received progesterone shot. Last menstrual period 6/15/80. Patient concerned about possible deformities. Complained of palpitations. Patient wants child if it will be okay.

Dr. Manley is a practicing OB–GYN in this community. You have had read to you a portion of his record in which Shultz said, in effect, 'I am concerned because I had a progesterone in oil injection.' Nothing was read to you as to what Dr. Manley responded to her. Where is Dr. Manley? The burden of proof in this case is on the plaintiff to establish that [Dr. Manley] did something that an ordinary, prudent physician would not have done.

. . . .

That has been the testimony, but where is Dr. Manley? Right here in the community. Why didn't he come to this jury and tell you what his opinion is? Ms. Shultz testified that, 'Dr. Manley told me he couldn't imagine any doctor giving me a shot of progesterone before determining if I was pregnant or not.' Couldn't imagine that. He hasn't been here to tell you that.

Judge O'Connor cautioned you about the hearsay testimony of Ms. Shultz and said that you are not to accept that as truth, only that she says it was told to her. But Dr. Manley hasn't come in to say that he told it to her or anything else about the care and treatment rendered by Dr. Rice. . . .

. . . .

Now, I suggest, ladies and gentlemen, there have been a lot of inferences made if these records were in any way altered. Why wasn't Dr. Manley brought in here to say what kinds of records he got from Dr. Rice, if they were the same as the ones that would have been produced here when he was subpoenaed and asked to bring his records to the deposition a year or so ago.

R. X, 81–83, 88.

Shultz contends these portions of Saunders' closing argument were improper because the parties had equal access to Dr.

Manley and Shultz' relationship with him was so brief, he could not be considered peculiarly available to her.[7]

Finding no Kansas caselaw directly on point, Dr. Rice cites an Eighth Circuit decision that holds a plaintiff's physician is presumed to be peculiarly available to the plaintiff and comments regarding the failure of the physician to testify are generally allowable. *Johnson v. Richardson*, 701 F.2d 753 (8th Cir.1983). Here, Shultz testified Dr. Manley's comments about the harmful effects of progesterone in oil on a fetus was a causative factor in creating her emotional distress, the basis of her claim for damages. Dr. Rice asserts Shultz' failure even to designate Dr. Manley as an expert witness creates an inference his testimony would have been unfavorable to her.

Shultz' testimony concerning Dr. Manley's uncorroborated statements was admitted as non-hearsay with the limiting instruction that the jury was not to consider it as truth, but rather, as what Shultz said was told her. Clearly, Shultz' choice not to call Dr. Manley, the sole physician she consulted, was highly relevant to the credibility of her testimony, especially where he was available to her and "[t]he term [available] takes into consideration that a treating physician is likely to be more sympathetic to his patient's case and would naturally tend to testify in his patient's favor if at all." *Johnson*, 701 F.2d at 757. Accordingly, we hold the district court did not commit manifest error by allowing Saunders' comment, during his closing argument, that no evidence existed to corroborate Shultz' testimony regarding her conversations with Dr. Manley.

C. *The district court's comment on the seriousness of Shultz' accusations that Dr. Rice altered his records*

■ At trial, Shultz attempted to show Dr. Rice altered or could have altered his

**7.** Shultz urges application of state law to this issue and cites two Kansas cases she claims support her position concerning the impropriety of Saunders' comments to the jury on the failure of Shultz' physician to testify. *Skelly Oil Co. v. Urban Renewal Agency of the City of Topeka,*

211 Kan. 804, 508 P.2d 954 (Kan.1973); *Spraker v. Lankin,* 218 Kan. 609, 545 P.2d 352 (Kan. 1976). These cases are inapposite to this action as they do not discuss an opponent's comments on a party's personal physician's failure to testify.

records after receiving the pregnancy test results by adding that Shultz denied sexual exposure before the pregnancy test was administered. After cross-examination of Dr. Rice along that line and immediately following his statement that he added, after her examination, the information concerning the removal of Shultz' ovary this exchange occurred:

(Shultz' counsel, William J. Pickett, questioning Dr. Rice.)

Q: But, doctor, that [information regarding the removal of Shultz' ovary] is a history matter, isn't it?

A: That is correct.

Q: And you put it under the exam, didn't you?

A: That is correct.

Q: Because the rest of your history material was up here, (indicating his head) isn't that correct?

A: That is correct.

Q: And that is because you put that in later after you found out she was pregnant, isn't that true, doctor?

A: No, that is not correct. I often examine a patient and take additional history while I am examining the patient. That is a very common way to do this. I would just like to say something—

Q: Doctor you have all the time in the world to answer. If you think this has been altered, then you ought to examine it and see whether it has been altered.

MR. PICKETT: Your Honor, I would respectfully request that you instruct the witness—

DR. RICE: I'm sorry.

MR. SAUNDERS: Well, Your Honor, I think he is making some strong inferences here.

THE COURT: You are making a lot of strong accusations that the doctor has altered—

MR. PICKETT: That is correct. Your Honor, I am.

THE COURT: So, I assume you have evidence to back that up.

MR. PICKETT: I am asking this man questions and—

THE COURT: Let's just proceed.

R. IX, 47, 48. At that juncture, the line of questioning shifted, and Pickett never returned to the issue of whether Dr. Rice altered his records.

Shultz asserts the court's comment from the bench showed favoritism thereby injuring her substantive right to trial before an impartial jury and unbiased judge. She further asserts the prejudice resulting from the comment was not overcome by Instruction No. 3, in which the court stated, "Neither in these instructions, nor in any ruling, action or remark that I have made during the course of this trial, have I intended to interpose any opinion or suggestion as to how I would resolve any of the issues of this case." R. II, 135. Shultz argues "[t]he word 'intended' is ambiguous and leaves it unclear for the jury whether the judge's actions or remarks during the course of the trial should or should not be considered as part of the law to be applied to the facts when making its decision." Shultz' brief at 18.

We agree with Dr. Rice that the district court did not commit manifest error by commenting on the seriousness of the allegations that Dr. Rice altered his records. Absent corroborative evidence of alteration, Shultz accomplished all she could have hoped in that regard, that is, she placed in the minds of the jury the idea that Dr. Rice could have altered his records to include Shultz' denial of sexual exposure. The court's comment did not go directly to the truth or falsity of that allegation, and its Instruction No. 3 specifically directed the jury to avoid any attempt to determine from its remarks or actions how the court would decide the case. We consider that instruction sufficient to overcome any prejudice caused Shultz by the court's comment from the bench.

D. *The court's response to the jury's question*

■ While sequestered, the jury sent this handwritten question to the court:

"We have decided which party is more probably true, than not true. Does this decision answer question one on form for civil action?" [8] The court responded by note with the following, "I do not understand your question. I believe the Instructions, as well as the verdict form, are clear."

We do not agree with Shultz' assertion the court committed manifest error by not attempting to clear any confusion that could have been created by the verdict form. Certainly, a district judge has a duty to guide the jury toward an intelligent understanding of the legal and factual issues it must resolve, particularly when the jury asks a question revealing its confusion over the central issue of a case. *Commercial Union Assurance Companies v. Sears, Roebuck and Co.*, 716 F.2d 606 (10th Cir.1983). However, the present jury indicated they had completed their deliberations as to fault before the note was sent, and their question related solely to completion of the verdict form. We see no indication the court's response to the note disturbed the jury's decision to return a verdict favorable to Dr. Rice.

8. Question one of the verdict form states:

> (1) Do you find any percentage of fault attributable to Bernard Rice, M.D.?
>
> Yes_____        No_____
>
> Note: If you answered "Yes," go to Question (2). If you answered "No," you will have completed your duties and judgment will be rendered in favor of the defendant.

9. Shultz submitted the following verdict form as per the Pattern Instructions of Kansas:

> We the jury, present the following answers to the questions submitted by the court:
>
> 1. Do you find any of the parties to be at fault?
>
> Answer yes or no:        _____
>
> 2. If you answer question number one yes, then, considering all of the fault at 100%, which percentage of the total fault is attributable to each of the parties?
>
> Jeanne L. Shultz        0% to 100% _____%
>
> Bernard Rice, M.D.        0% to 100% _____%
>
> Answer question 3 only if you find any of the parties to be at fault.
>
> 3. Without considering the percentage of fault found in question two, what total amount of

### E. The district court's modification of the verdict forms submitted by counsel

■ First, Shultz complains she was prejudiced by the district court's submission of a verdict form other than that suggested by the Pattern Instructions of Kansas.[9] However, the district court was not required to follow the Kansas guidelines for verdict forms because federal, not state law, governs the submission of special verdicts or interrogatories. *Bartak v. Bell-Galyardst & Wells, Inc.*, 629 F.2d 523, 528 (8th Cir.1980).

Second, Shultz did not oppose the submission of the court's verdict form but now asserts she was prejudiced because it focused on Dr. Rice and did not ask the jury to weigh the fault of the parties. We believe, after comparison of the verdict forms at issue, that any bias possibly created by the court's verdict form benefited Shultz. The court's form asked only about Dr. Rice's liability in the first question and addressed comparative liability in the second. The form also contained the instruc-

> damages do you find was sustained by the following parties?
>
> Jeanne L. Shultz        $_____

The verdict form offered by Dr. Rice varied insignificantly from Shultz' form. The court submitted to the jury the following verdict form:

> We, the jury, duly impaneled and sworn, upon our oaths, present the following answers to the questions submitted by the court:
>
> 1) Do you find any percentage of fault attributable to Bernard Rice, M.D.?
>
> Yes_____        No_____
>
> 2) According to the instructions the court has given regarding the causal responsibility of those involved, considering all causal responsibility at one hundred percent (100%), what percentage of the total causal responsibility is attributable to each of the following:
>
> Bernard Rice, M.D. _____% (0% to 100%)
>
> Jeanne Shultz _____% (0% to 100%)
>
> Total _____% (0% to 100%)
>
> 3) Without considering the percentage of causal responsibility found in Question (2), what total amount of damages [do] you find was sustained by the plaintiff?
>
> $_____

tion that the jury need proceed to the second question only in the event it determined a percentage of fault was attributable to Dr. Rice, thereby first centering the jury's attention solely on the doctor's liability.

Further, the evidence in this case was sharply divided, and the jury was required to decide which version of the facts it accepted. Its answer to the first question indicates the jury believed Dr. Rice, and there appears no reason it should have been subjected to the additional burden of determining comparative fault where it found none. Accordingly, submission of the court's verdict form did not result in manifest error.

### III

We now turn to Shultz' contentions that are properly before us. Absent a showing of clear abuse of its discretion, the district court's evidentiary rulings will not be disturbed. *Beacham v. Lee-Norse*, 714 F.2d 1010, 1014 (10th Cir.1983).

### A. *Saunders' request that the jury place themselves in Dr. Rice's position*

■ During his closing argument, Saunders made the following appeal to the jury to determine Dr. Rice's liability by placing themselves in his position at the time he injected Shultz with progesterone in oil:

MR. SAUNDERS: And as has been explained very carefully, this was all put into one big group of sex hormones with a lot of other drugs such as birth control pill, high estrogen content drugs, and that is where the progesterone was placed. They have indicated to you, and they are very reputable doctors in this community, that it is a matter of judgment what you tell a patient. In this case, you must place yourself in the position of Dr. Rice on August 8—

MR. PICKETT: I object, Your Honor. It is inappropriate argument to ask persons on the jury to personalize and place themselves—

THE COURT: I think, members of the jury, you will have to be governed by the evidence. You are not doctors. You judge this solely by the evidence and the Court's instructions as to the law.

MR. SAUNDERS: You must consider this case based upon the events that took place August 8, 1980, what was being done at that time, not by what you know today based upon the subsequent events that turned out to establish that she was pregnant.

Now an issue in this case which one— it is difficult to explain, I think, is the fact that if he was going to order a pregnancy test why didn't he wait for the result. He testified that the purpose in giving the progesterone in oil was for the purpose of attempting to help him in his differential diagnosis, as was the pregnancy test. He waited for the results of the pregnancy test and had they come back negative for pregnancy, then he would have had her come back into the office for the progesterone injection some hour, two hours later. That doesn't seem like a big thing to do, if there is a possibility of pregnancy, but you have to look at it, as I said before, in the eyes of Dr. Rice on August 8, 1980, in his efforts to make a differential diagnosis. As somewhat of an afterthought, he ordered the urinalysis. He had already ordered the blood test not only for the pregnancy, but for other matters that one test was for.

So, I believe that there is a logical explanation as to why he did what he did from the standpoint of attempting to make a diagnosis....

R. X, 79–81.

Shultz asserts the district court erred in overruling her objection to Dr. Rice's alleged "golden rule" closing argument. However, her reliance on the "golden rule" cases is misplaced: "they deal with arguments in which the jury is exhorted to place itself in a party's shoes *with respect to*

*damages."* [10] *Burrage v. Harrell,* 537 F.2d 837, 839 (5th Cir.1976); *see, e.g., Skaggs v. J.H. Rose Truck Line, Inc.,* 435 F.2d 695 (5th Cir.1970); *Har-Pen Truck Lines, Inc. v. Mills,* 378 F.2d 705, 714 (5th Cir.1967). Use of the "golden rule" argument "is not improper when urged on the issue of ultimate liability." *Stokes v. Delcambre,* 710 F.2d 1120, 1128 (5th Cir.1983). The *Burrage* Court rejected application of the argument to defense counsel's asking the jury to place itself in the position of the defendant whose vehicle collided with the plaintiff's vehicle as the plaintiff backed toward a freeway exit. That Court stated:

> [T]he argument complained of was not in any way directed to the question of damages; rather it related only to the reasonableness of appellee's actions under emergency conditions. The argument was not immoderate or unduly emotional and the trial court instructed the jury quite fully on the reasonable person standards of negligence. In these circumstances, the "golden rule" cases are inappropriate and no prejudicial error has been established.

*Burrage,* 537 F.2d at 839.

Similarly, Saunders' remarks were directed solely to the reasonableness of Dr. Rice's administration of progesterone in oil treatment to Shultz under the conditions that existed August 8, 1980. Further, after Shultz' objection, Saunders stated more clearly the meaning of his request to the jury to place themselves in Dr. Rice's position by reminding them to consider the reasonableness of Dr. Rice's actions in light of the information he possessed at the time of the injection but before the return of the pregnancy test results. Saunders' argument can hardly be characterized as an emotional appeal when he merely directed the minds of the jury toward the ultimate question of Dr. Rice's liability. Moreover, the court's comment following Shultz' objection sufficiently admonished the jury to weigh Saunders' argument against the whole of the evidence and the law presented them.

We find the district court did not abuse its discretion by overruling Shultz' objection to Saunders' remarks in closing argument.

**B.** *Admission of evidence Shultz was unmarried at the time of her pregnancy*

■ The propriety of Saunders' mentioning Shultz' single status was first discussed before opening statements. Pickett argued for exclusion, as irrelevant and prejudicial, of all information concerning Shultz not specifically contained in her medical history made available to Dr. Rice. The information included references to Shultz' cocaine use, psychological disorders, female problems, and previous abortion. The fact that Shultz was single at the time of her pregnancy was also not expressly stated in the medical history. The court refused to make the preliminary rulings saying it preferred to take evidence and rule on objections in their context; however, it prohibited mention in opening statements of information not included in the medical history. Saunders then informed the court he intended to address, in his opening statement, Dr. Rice's knowledge that Shultz was unmarried at the time of her pregnancy because it was relevant to the reasonableness of Dr. Rice's treatment of her amenorrhea. The court agreed Shultz' marital status was highly relevant to the credibility of Dr. Rice's testimony concerning Shultz' denial of sexual exposure and allowed Saunders to mention Dr. Rice's knowledge of Shultz' unmarried status as a fair statement of evidence that would be presented.

Shultz asserts admission of the evidence denied her a fair trial by labeling her "unmarried and pregnant" and conjuring jury perceptions of her as a " 'loose woman,' 'irresponsible' [and] 'the kind of woman

---

**10.** "The rationale for prohibiting such an argument is that the jury's sympathy will be unfairly aroused, resulting in a disproportionate award of damages." *Burrage,* 537 F.2d at 839 (citations omitted).

you wouldn't want to babysit your own children.'" Shultz' brief at 9.

Dr. Rice counters the mention of Shultz' single status was not offered to prove she acted as an unmarried person, but rather to show the factors relied upon by Dr. Rice in reaching his medical conclusions regarding the probability Shultz was not pregnant and the likelihood her amenorrhea was attributable to some other pathology.

We believe Dr. Rice's knowledge that Shultz was unmarried at the time of her pregnancy was clearly relevant to the reasonableness of Dr. Rice's medical conclusions and resulting treatments, as well as to the credibility of his testimony concerning Shultz' denial of sexual exposure. We find the district court did not abuse its discretion by allowing Saunders to mention and introduce evidence concerning Shultz' marital status at the time of her pregnancy.

C. *Evidence Shultz' expert witness was once director of the world's largest abortion clinic*

■ The testimony of Dr. Bernard Nathanson, Shultz' sole expert witness on the issue of the standard of care used by Dr. Rice, was presented to the jury by reading from his deposition. Shultz contends she was prejudiced by the admission of the following cross-examination concerning Dr. Nathanson's credentials (Saunders questioning Dr. Nathanson):

Q: One of the publications listed on your curriculum vitae is a book called *Aborting American* [sic], is that correct?

A: That's correct.

Q: One of the other publications listed here is a bibliography, Item Number 10, called 'Ambulatory Abortions,' experience, 26,000 cases, dated February 4, 1972. What is that 'Ambulatory Abortions' paper about?

A: It's about performing abortions on an ambulatory or walk-in basis.

Q: Is that [what] you were doing at [that] period of time in your medical career?

A: In 1972, I was the director of the largest abortion clinic in the world.

Q: How many abortions were being performed there on a regular basis at that time?

A: 120 a day. I wasn't doing the abortions. I was merely director of the clinic.

Q: Over how long a period of time did that take place that you were the director of that clinic?

A: Almost two years.

Q: Is the 26,000 cases the estimate of how many abortions were done during that two-year period?

A: No.

Q: How many were done during that two-year period?

A: Sixty thousand.

R. VIII, 129, 130.

During the deposition, Shultz' counsel neither objected to, attempted to clarify, nor moved to strike Dr. Nathanson's testimony concerning his directorship of the abortion clinic. At trial, the court overruled Saunders' objection to having that portion read into the record.

Shultz argues this evidence should have been excluded under Fed.R.Evid. 403 because it was prejudicial, inflammatory and irrelevant to the weighing of Dr. Nathanson's credentials as an expert witness in this case. She contends the amalgam effect of the errors below was to cast the parties as "good guys" and "bad guys." Shultz' brief at 11.

Dr. Rice asserts a full reading of Dr. Nathanson's professional history and credentials was essential to allow the jury to assess his relative credibility and expertise and decide the weight to be given his opinions. Further, there existed ample opportunity to rehabilitate Dr. Nathanson because he now leads a national movement against abortion and is the narrator of an anti-abortion video entitled, "The Silent Scream." Indeed, the dust jacket of *Aborting America* contains the following information about Dr. Nathanson:

A well-known obstetrician and gynecologist at one time the most prominent doctor in the fight to repeal abortion laws. Now, after years of philosophical and moral struggle, believes that abortion on request is wrong. *Aborting America* is about the evolution of Dr. Bernard N. Nathanson's beliefs as well as the changes that went on in medicine and in the country during those years.

Dr. Rice's brief at 12.

We hold the district court did not abuse its discretion by admitting evidence concerning Dr. Nathanson's experience as director of an abortion clinic. The jury is entitled to weigh the whole of an expert's credentials, and where the subject of abortion has equally active proponents and opponents, we are not inclined to second-guess the impact of the evidence on individual jurors. Moreover, Shultz had adequate opportunity at trial to correct what she considered error, but she chose not to rehabilitate Dr. Nathanson.

### D. *Saunders' use of leading questions to cross-examine Dr. Rice*

▪ After Shultz called Dr. Rice as an adverse witness, Saunders began cross-examining his client with leading questions. The district court engaged in the following colloquy in response to Shultz' objection to the cross-examination:

MR. PICKETT: Your Honor, I object to this as leading. This is supposed to be a direct examination.

THE COURT: Overruled. This is cross-examination. You called him as your witness.

MR. PICKETT: Your Honor, may I respectfully state for the record that it is the other way around. I called him as an adverse witness.

THE COURT: Overruled. You have a right to call him as an adverse witness and ask leading questions. Now, that opens it up to counsel, too.

R. IX, 94.

We agree with Shultz that the district court erred in its statement that Shultz' calling of Dr. Rice as an adverse witness automatically opened the door for Saunders' cross-examination by leading questions. Rule 611(c), Federal Rules of Evidence, states:

> Leading questions should not be used on direct examination of a witness except as may be necessary to develop his testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

The advisory committee's note to subsection (c) explains:

> [t]he purpose of the qualification 'ordinarily' is to furnish a basis for denying the use of leading questions when the cross-examination is cross-examination in form only and not in fact, as for example the 'cross-examination' of a party by his own counsel after being called by the opponent. . . .

Fed.R.Evid. 611(c) advisory committee's note. The instant scenario involving the questioning of Dr. Rice by his own counsel is precisely that characterized in the note as "cross-examination in form only and not in fact," and therefore, should not have been allowed as a matter of right. However, our reading of the subject portion of the cross-examination shows Saunders asked Dr. Rice preliminary questions related to undisputed facts, such as Dr. Rice's office procedures for billing patients for blood tests and the date he sent his records to Dr. Manley. Subsection (a) of Rule 611 addresses the court's discretion in controlling witness examination:

> The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, [and] (2) avoid needless consumption of time, . . .

And, as stated in Rule 611(c), leading questions are allowed on direct examination when "necessary to develop [a witness'] testimony." We consider the leading ques-

tions asked Dr. Rice by Saunders archetypical of those allowed during direct examination to develop testimony and expedite entry into evidence of time-consuming foundational information. Accordingly, the district court did not abuse its discretion by allowing Saunders to use leading questions at the outset of his cross-examination of Dr. Rice.

E. *The district court's submission to the jury of Instruction No. 4*

■ The district court submitted to the jury the following instruction, in relevant part: "The defendant also states that the plaintiff was further at fault in failing to contact Dr. Rice and discuss with him her concerns concerning an injection of progesterone in oil after she had been given certain information concerning such injections from other sources."

Shultz cites *Brownlow v. Aman* in her assertion the instruction was improper because it was not supported by sufficient competent evidence. 740 F.2d 1476, 1489 (10th Cir.1984). We note the *Brownlow* instructions were refused because, although accurate statements of the law, their application required facts not in evidence. Here, Shultz and Dr. Rice offered conflicting testimony concerning whether Shultz had an opportunity to discuss with Dr. Rice her fears resulting from the statements of those who allegedly told her the progesterone in oil treatment could cause fetal damage. Consequently, the present instruction is distinguishable from those in *Brownlow* because it concerned a question of fact supported by sufficient evidence for submission to the jury. Further, where the district court accepted Instruction No. 4 as a "contention" that merely set forth Dr. Rice's position, we conclude it did not abuse its discretion by submitting it for that purpose. The jury found Dr. Rice had no fault, and nothing indicates this instruction on comparative liability affected the verdict in any significant way.

F. *Denial of Shultz' Motion for a New Trial*

■ Parties seeking reversal of a jury verdict or of a denial of a motion for new trial must establish the alleged trial errors were both prejudicial and clearly erroneous. *Rasmussen Drilling, Inc. v. Kerr-McGee Nuclear Corporation,* 571 F.2d 1144, 1148 (10th Cir.), *cert. denied,* 439 U.S. 862 (1978). A choice made by the finder of fact between two permissible views of the evidence is not clearly erroneous and is conclusively binding on appeal. *United States v. Yellow Cab Company,* 338 U.S. 338, 70 S.Ct. 177, 94 L.Ed. 150 (1949); *White v. Conoco, Inc.,* 710 F.2d 1442, 1448 (10th Cir.1983); *Rasmussen Drilling,* 571 F.2d at 1148, 1149. The appellate court must consider the evidence in the light most favorable to the prevailing party. *Joyce v. Davis,* 539 F.2d 1262 (10th Cir.1976). And, under the Supreme Court's recent decision in *United States v. Lane,* we can reverse only upon a finding that an error below "affects substantial rights" and "results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" — U.S. —, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)).

Shultz' argument concerning the district court's denial of her motion for a new trial centers on Kansas law governing informed consent. The law provides that a physician has a duty to exercise skill ordinarily possessed by other similarly located physicians by making reasonable disclosure to the patient of facts concerning proposed treatment, so the patient can intelligently consent to or refuse the treatment. *See, e.g., Malone v. University of Kansas Medical Center,* 220 Kan. 371, 552 P.2d 885, 888 (Kan.1976). Shultz contends Dr. Rice's admitted failure, before the injection of progesterone, to inform Shultz of potential damage the treatment could cause her fetus, shows that the verdict was clearly against the weight of the evidence and that a new trial should be granted.

Dr. Rice counters that Kansas law provides a subjective test for determining the

reasonableness of informing a patient of all possible consequences of a treatment. The test allows consideration of the mental and emotional stability of the patient, *Funke v. Feldman*, 212 Kan. 524, 512 P.2d 539 (1973), and contemplates circumstances in which no disclosure would be justified or in which a physician would engage in bad therapeutic practice to disclose the full nature, procedure, or potentially harsh results of treatment. *Natanson v. Kline*, 187 Kan. 186, 354 P.2d 670 (1960); *Collins v. Meeker*, 198 Kan. 390, 424 P.2d 488 (1967). Dr. Rice claims he did not discuss with Shultz the risk of damage to her fetus because he neither considered the progesterone in oil treatment dangerous nor wished to alarm her unnecessarily. He further asserts Shultz failed to meet her burden of showing occurrence of the risk Dr. Rice should have disclosed. *Funke*, 512 P.2d 539.

On this point, we find compelling the weight of the expert testimony to the effect that although medical findings show defined risk resulting from treatment of pregnant women with synthetic progesterone, the findings do not produce evidence of fetal malformation resulting from a treatment of progesterone in natural oil. Indeed, Shultz' expert witness, Dr. Rush, testified there is no essential difference between the progesterone in oil Shultz received and the progesterone in oil naturally produced by pregnant women. This appears to be the agreement of the opinions of Shultz' experts witnesses, Dr. Nathanson and Dr. Rush. Dr. Rice's medical experts, with the exception of Dr. Betts, testified the progesterone in oil treatment would not harm a fetus and they would not feel obligated to disclose potential risk to a pregnant woman who had received the treatment. On cross-examination, Dr. Betts stated he would have informed a patient in Shultz' condition of the FDA warning concerning the progesterone in oil treatment, but he would have told her the warning was "not of any consequence" and "encourage[d] her to consider it not a factor." R. IX, 178, 179. Dr. King, a defense witness and specialist in the area

of birth defects and fetal malformation, testified that progesterone in oil is sometimes purposefully given to a pregnant woman to facilitate her pregnancy. He also stated Dr. Rice met the community standard of care in his advice and treatment of Shultz.

This expert evidence, coupled with what the jury could have found to be Dr. Rice's reasonable belief that Shultz had not engaged in sexual activity during the relevant time, amply supports Dr. King's conclusion that Dr. Rice's actions met the community standard of care. Particularly damaging to Shultz in this case of sharply conflicting testimony, was her failure to produce evidence, beyond her own statement, of the communications and literature that allegedly caused her emotional distress. Our review of the record in a light most favorable to the prevailing party convinces us the jury's verdict for Dr. Rice was not rendered against the weight of the evidence.

Accordingly, we find the district court committed no clear or prejudicial error that affected Shultz' substantive rights and significantly influenced the jury's verdict, and affirm the district court's denial of Shultz' motion for a new trial.

AFFIRMED.